# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT ROBINSON, as Independent Administrator of the Estate of CORY ULMER, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 25-cv-06643 |
| COOK COUNTY SHERIFF, in his official capacity; SERGEANT ENRIQUE REYES (#3379); OFFICER KARLTON DAVIS (#15430); OFFICER CHAD SPRAYBERRY (#17560); OFFICER JOSHUA GARCIA (#16401); OFFICER DANIEL ALVAREZ (#17342); OFFICER KYLE CODD (#18348); OFFICER MICHAEL MATANIC (#16451); OFFICER JASON JACKSON (#17877); OFFICER JOHN LESNICKI (#16596); OFFICER BRENT O'HEARN (#16544); OFFICER JOSHUA NOVAK (#15806); OFFICER JOHN PRETO (#17344); OFFICER MARIO RAJKOWSKI (#15651); OFFICER RAMIRO ROMO (#17159); OFFICER THOMAS KAVANAUGH (#18920); LIEUTENANT LEROY KELLY; EXECUTIVE DIRECTOR JUSTIN WILKS; DIRECTOR BRYAN CARR; ASSISTANT DIRECTOR LONNIE HOLLIS; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| COOK COUNTY, ILLINOIS, a unit of local government and d/b/a COOK COUNTY HEALTH AND HOSPITALS SYSTEM and CERMAK HEALTH SERVICES OF COOK COUNTY; RINA TRANI; MARGHOOB KHAN, M.D.; LAUREN MUNOZ; AHLEAH BALAWENDER, PA-C; BUNMI OMODARA, R.N.; SOUMYA JAMES, R.N.; ANITA JOHNSON; GARY SHEEHAN, RN; YASER HAQ, M.D; MINA TAWADROS, M.D.; and LENA COLON, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT AT LAW

Plaintiff, ROBERT ROBINSON, individually and as the Independent Administrator of the

Estate of CORY ULMER, Deceased, by his attorney, GUTH LAW OFFICE, LLC, brings this

action against Defendants, the COOK COUNTY SHERIFF (in his official capacity); COOK COUNTY, ILLINOIS, a unit of local government and d/b/a Cook County Health and Hospitals System and Cermak Health Services of Cook County; SERGEANT ENRIQUE REYES (#3379); OFFICER KARLTON DAVIS (#15430); OFFICER CHAD SPRAYBERRY (#17560); OFFICER JOSHUA GARCIA (#16401); OFFICER DANIEL ALVAREZ (#17342); OFFICER KYLE CODD (#18348); OFFICER MICHAEL MATANIC (#16451); OFFICER JASON JACKSON (#17877); OFFICER JOHN LESNICKI (#16596); OFFICER BRENT O'HEARN (#16544); OFFICER JOSHUA NOVAK (#15806); OFFICER JOHN PRETO (#17344); OFFICER MARIO RAJKOWSKI (#15651); OFFICER RAMIRO ROMO (#17159); OFFICER THOMAS KAVANAUGH (#18920); LIEUTENANT LEROY KELLY; EXECUTIVE DIRECTOR JUSTIN WILKS; DIRECTOR BRYAN CARR; ASSISTANT DIRECTOR LONNIE HOLLIS; RINA TRANI; MARGHOOB KHAN, M.D.; LAUREN MUNOZ; AHLEAH BALAWENDER, PA-C; BUNMI OMODARA, R.N.; SOUMYA JAMES, R.N.; ANITA JOHNSON; GARY SHEEHAN, R.N.; YASER HAQ, M.D; MINA TAWADROS, M.D.; and LENA COLON, and complaining of each of them, states as follows:

## PRELIMINARY STATEMENT

1.      This is an action for damages brought pursuant to 42 U.S.C. § 1983, the Illinois Wrongful Death Act (740 ILCS 180/1, *et seq*.), and the Illinois Survival Act (755 ILCS 5/27-6) arising from the death of CORY ULMER, a 41-year-old pretrial detainee who died on June 21, 2024, while in custody at the Cook County Jail. ULMER was arrested on June 20, 2024, for an electronic monitoring violation. During his intake and screening at the Jail, ULMER was classified as "P4," the Jail's highest psychiatric classification.

2.     ULMER was detained for approximately 36 hours in a holding cell without a bed, toilet, or sink. During that time, correctional officers subjected ULMER to prolonged periods of bodily restraint, shackling him inside a holding cell. ULMER was not administered any of his prescribed psychotropic medication and was given only one dose of his diabetes medication.

3.     On June 21, 2024, correctional officers used excessive force against ULMER in two separate incidents. During the first use-of-force incident, three officers caused ULMER to fall and strike his head on a metal pole outside of his cell. The correctional officers involved did not report the incident or ULMER's injury. Autopsy evidence revealed ULMER suffered a traumatic head injury, which led to a subarachnoid brain hemorrhage.

4.     The second use-of-force incident occurred approximately eight hours later, and the on-duty sergeant deliberately deactivated his body-worn camera. Numerous correctional officers dragged ULMER out of view of surveillance cameras and beat him while he was restrained with handcuffs and leg shackles. ULMER was then injected with sedatives and placed into a restraint chair. After ULMER was discovered to be non-responsive, an employee of CERMAK HEALTH SERVICES eventually dialed 9-1-1. EMS access to ULMER's location was obstructed for almost 20 minutes.

5.     ULMER was declared deceased at Mount Sinai Hospital at 4:27 PM on June 21, 2024. For hours after ULMER's in-custody death, the COOK COUNTY SHERIFF refused to notify the Cook County Medical Examiner or allow ULMER's body to be transported to the Mount Sinai Hospital morgue. As a result, the Cook County Medical Examiner investigator did not arrive at the Jail until after midnight. By that time, the scene at CERMAK HEALTH SERVICES had been cleared. The Cook County Medical Examiner ruled ULMER's death a homicide.

6.    This suit seeks to redress the deprivation under color of law of the rights of CORY ULMER as secured by the Fourteenth Amendment to the United States Constitution and claims under the laws of the State of Illinois by the actions, omissions, policies, and procedures of the COOK COUNTY SHERIFF, COOK COUNTY through CERMAK HEALTH SERVICES, as well as the employees and agents of each.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 1331. This Court has supplementary jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8.    Venue is proper under 28 U.S.C. § 1391(b), as the events giving rise to the claims asserted herein all occurred within Cook County, Illinois, located in the Northern District of Illinois, Eastern Division.

## PARTIES

9.    CORY ULMER died at the age of forty-one (41) on June 21, 2024, while a pre-trial detainee in the Cook County Department of Corrections at the Cook County Jail (the "Jail") in Chicago, Illinois. At the time of his death, ULMER was a Black male, a citizen of the United States, and resided in Chicago, Illinois.

10.    The Plaintiff, ROBERT ROBINSON, has been ULMER's stepfather since 1990, when he married ULMER's mother, who is deceased. ROBINSON is the father of ULMER's two sisters, a citizen of the United States, and currently resides in Naperville, Illinois.

11.    On August 7, 2024, by order of the Circuit Court of Cook County (case no. 24P4592), ROBINSON was lawfully and duly appointed Independent Administrator of the Estate of CORY ULMER. ROBINSON brings this suit on behalf of the Estate and its beneficiaries.

12.     At all relevant times relevant to this case, Defendant Tom Dart, the COOK COUNTY SHERIFF, served as the elected Sheriff of Cook County and acted under color of law. The COOK COUNTY SHERIFF is the warden of the Jail and was responsible for the operations, policies, and/or management of the Cook County Sheriff's Office and the Cook County Department of Corrections. The COOK COUNTY SHERIFF was also responsible for the hiring and training of all personnel employed by the Cook County Sheriff's Office, for the safety and security of all detainees at the Jail, and for ensuring detainees received adequate medical care. At all relevant times, the COOK COUNTY SHERIFF was the final policy maker for the Cook County Sheriff's Office and the Jail. The COOK COUNTY SHERIFF is being sued in his official capacity.

13.     At all relevant times, Defendant COOK COUNTY was and is a unit of local government duly incorporated under the laws of the State of Illinois. COOK COUNTY owns and finances the Jail.

14.     At all relevant times, COOK COUNTY through the Cook County Health and Hospitals System ("CCHHS") and its various facilities, including CERMAK HEALTH SERVICES of Cook County, provided medical services. Specifically, COOK COUNTY owned, operated, maintained, managed, controlled, funded, staffed, and/or employed personnel at CCHHS and its facility CERMAK HEALTH SERVICES, which is and was a medical facility serving the detainees in the Jail, and provided medical services to patients therein.

15.     At all relevant times, the COOK COUNTY SHERIFF agreed to work collaboratively with COOK COUNTY through CERMAK HEALTH SERVICES to ensure their respective agents and employees provided medical and psychiatric care to detainees in the Jail.

16.     At all relevant times, SERGEANT ENRIQUE REYES (#3379) was a correctional sergeant in the Jail. SERGEANT REYES was regularly assigned as the Building Sergeant

responsible for supervising the CERMAK HEALTH SERVICES building. He is being sued in his individual capacity.

17.     At all relevant times, OFFICER KARLTON DAVIS (#15430); OFFICER CHAD SPRAYBERRY (#17560); OFFICER JOSHUA GARCIA (#16401); OFFICER DANIEL ALVAREZ (#17342); OFFICER KYLE CODD (#18348); OFFICER MICHAEL MATANIC (#16451); OFFICER JASON JACKSON (#17877); OFFICER JOHN LESNICKI (#16596); OFFICER BRENT O'HEARN (#16544); OFFICER JOSHUA NOVAK (#15806); OFFICER JOHN PRETO (#17344); OFFICER MARIO RAJKOWSKI (#15651); OFFICER RAMIRO ROMO (#17159); OFFICER THOMAS KAVANAUGH (#18920) were correctional officers at the Jail. Each is being sued in his individual capacity.

18.     At all relevant times, LIEUTENANT LEROY KELLY, JR. was a correctional lieutenant in the Jail. He is being sued in his individual capacity.

19.     At all relevant times, EXECUTIVE DIRECTOR JUSTIN WILKS was employed by the COOK COUNTY SHERIFF as Executive Director of Custodial Investigations. He is being sued in his individual capacity.

20.     At all relevant times, DIRECTOR BRYAN CARR was employed by the COOK COUNTY SHERIFF as Director of Custodial Investigations. He is being sued in his individual capacity.

21.     At all relevant times, ASSISTANT DIRECTOR LONNIE HOLLIS was employed by the COOK COUNTY SHERIFF as Assistant Executive Director. He is being sued in his individual capacity.

22.     At all relevant times, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER

MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH (collectively, the "SHERIFF'S OFFICER DEFENDANTS"), along with LIEUTENANT LEROY KELLY, EXECUTIVE DIRECTOR JUSTIN WILKS, DIRECTOR BRYAN CARR, and ASSISTANT DIRECTOR LONNIE HOLLIS, were employees of the COOK COUNTY SHERIFF. At all relevant times, the SHERIFF'S OFFICER DEFENDANTS, LIEUTENANT KELLY, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS were each engaged in the complained of conduct while acting within the scope of their employment and under color of state law.

23.     At all relevant times to the events at issue in this case, the COOK COUNTY SHERIFF promulgated regulations, policies and procedures, and was subject to state laws, federal laws, and institutional guidelines, regarding the training, supervision, and discipline of the Jail and its correctional officers that concerned, *inter alia*: (1) detainee intake procedure, (2) transporting detainees between cell blocks and/or to and from cells within the same cell block; (3) communicating or failing to communicate detainee requests; (4) the use of force; (5) the use of restraints; and (6) properly filling out Incident and Use of Force Reports; (7) preservation of evidence, and (8) requirements surrounding body worn cameras. The COOK COUNTY SHERIFF's policies were implemented by and through its employees, including each of the SHERIFF'S OFFICER DEFENDANTS, LIEUTENANT KELLY, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS.

24.     At all relevant times, RINA TRANI and LENA COLON were paramedics in the State of Illinois working at CERMAK HEALTH SERVICES at the Jail. Each is being sued in their individual capacity.

25. At all relevant times, LAUREN MUNOZ and ANITA JOHNSON were working as Mental Health Specialists at CERMAK HEALTH SERVICES at the Jail. Each is being sued in their individual capacity.

26. At all relevant times, AHLEAH BALAWENDER, PA-C ("Balawender"), also known as AHLEAH SALEFSKI, was a physician's assistant working at CERMAK HEALTH SERVICES at the Jail. She is being sued in her individual capacity.

27. At all relevant times, BUNMI OMODARA, R.N., SOUMYA JAMES, R.N., and GARY SHEEHAN, R.N. were registered professional nurses in the State of Illinois working at CERMAK HEALTH SERVICES at the Jail. Each is being sued in their individual capacity.

28. At all relevant times, MARGHOOB KHAN, M.D., YASER HAQ, M.D., and MINA TAWADROS, M.D. were licensed physicians in the State of Illinois working at CERMAK HEALTH SERVICES at the Jail. Each is being sued in their individual capacity.

29. At all relevant times, TRANI, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, KHAN, HAQ, and TAWADROS (collectively, the "CERMAK HEALTH DEFENDANTS") were employees of COOK COUNTY through CERMAK HEALTH SERVICES. At all relevant times, each of the CERMAK HEALTH DEFENDANTS were engaged in the complained of conduct while acting within the scope of their employment and under color of state law.

30. At all relevant times, the COOK COUNTY SHERIFF and the SHERIFF'S OFFICER DEFENDANTS authored, or should have authored, reports outlining use of force, incidents, accidents, field notes, or other records containing information depicting their personal involvement and contact relating to ULMER's time in custody between June 20 and June 21, 2024.

8

31.     At all relevant times, the SHERIFF OFFICER DEFENDANTS were issued body-worn cameras with audio and video recording capability or are depicted on video cameras located throughout the jails, including tier videos, between June 20 and June 21, 2024.

32.     At all relevant times, COOK COUNTY, through its employees and agents working at CERMAK HEALTH SERVICES, authored or should have authored medical records, including medication administration records, consultations, restriction notices, or evaluations reflecting physical and mental health examinations which were created at or near the time of observation, containing diagnoses and impressions relating to observation and/or depicting ULMER's time in custody between June 20 and June 21, 2024.

33.     At all relevant times, the COOK COUNTY SHERIFF was party to one or more Inter-Agency Agreements with COOK COUNTY requiring each of them to coordinate to deliver healthcare and mental healthcare to detainees at the Jail.

## COMMON ALLEGATIONS

34.     On January 4, 2023, CORY ULMER was arrested by the Chicago Police Department and remanded to the custody of the Jail.

35.     Upon his admission into the Jail on or around January 6, 2023, ULMER underwent intake screening and evaluation by employees of the COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES, which included documentation of ULMER's medical and psychiatric history; his mental health diagnoses of bipolar disorder and paranoia; his type 2 diabetes, which was non-insulin-dependent; as well as his prescribed medications and symptoms.

36.     Between January 6, 2023, and March 17, 2023, ULMER remained in custody at the Jail. During that time, ULMER received treatment from numerous CERMAK HEALTH

SERVICES employees, including Defendants RINA TRANI; MARGHOOB KHAN, M.D.; AHLEAH BALAWENDER, PA-C; ANITA JOHNSON; and SOUMYA JAMES, R.N.

37.     On or around March 17, 2023, ULMER was granted pretrial release and placed on the COOK COUNTY SHERIFF's electronic monitoring program. Upon discharge, ULMER was given prescriptions for metformin, a medication used to treat high blood sugar in type-2 diabetics, as well as prescriptions for risperidone and carbamazepine, two medications for bipolar disorder.

38.     At all relevant times, ULMER was considered a pre-trial detainee, as he had not been convicted of any of the allegations in his underlying criminal case.

39.     On June 20, 2024, around 1:45 AM, several Electronic Monitoring Unit Officers of the COOK COUNTY SHERIFF took ULMER into custody near Midway International Airport for allegedly violating his electronic monitoring conditions.

40.     During the interaction, the officers stated that they believed ULMER was "off his meds" and discussed whether to return him home or to the Jail.  Eventually, a decision was made to transport ULMER to the Jail so he could be given medication if needed.

41.     ULMER asked the COOK COUNTY SHERIFF's Officers if they were trying to kill him. Less than 48 hours later, ULMER was dead.

42.     The responding officers classified ULMER as a "P3" patient. Psychiatric patients are assigned a value of one through four, with P4 representing the most severe psychiatric issues.

43.     At approximately 6:30 AM on June 20, 2024, CERMAK HEALTH SERVICES paramedic RINA TRANI performed an initial intake screen on ULMER.

44.     TRANI confirmed ULMER's previous mental health diagnoses of bipolar disorder and paranoia, as well as his prescriptions of metformin and "psych meds." TRANI listed every

problem in ULMER's history on his prior charts, including a pneumonia diagnosis from 2010, as an "active problem." TRANI also took ULMER's vitals.

45.     Approximately one hour later, CERMAK HEALTH SERVICES physician MARGHOOB KHAN, M.D., performed a medical evaluation of ULMER. KHAN noted that ULMER denied any chest pain, shortness of breath, dizziness, headache, abdominal pain, nausea, vomiting, or any other complaints. KHAN prescribed ULMER metformin and two additional PRN (as-needed) IV medications for his diabetes.

46.     KHAN noted ULMER's history of psychiatric diagnoses and reviewed ULMER's current medication list. However, KHAN did not prescribe any psychotropic interventions for ULMER or order that ULMER's current prescription of risperidone be continued.

47.     At approximately 8:19 AM, CERMAK HEALTH SERVICES physician's assistant AHLEAH BALAWENDER, PA-C, entered an order that ULMER be classified as a P4, receive a "high" mental health level of care, and be transferred to CERMAK HEALTH SERVICES. BALAWENDER did not enter any notes documenting a face-to-face encounter with or assessment of ULMER. BALAWENDER did not prescribe ULMER any medication on June 20, 2024.

48.     At approximately 9:00 AM, CERMAK HEALTH SERVICES Mental Health Specialist LAUREN MUNOZ performed a mental health assessment on ULMER. MUNOZ recorded that, when ULMER arrived at her office, it appeared to her that his head, face, and shirt were wet. MUNOZ reported that ULMER informed her that the man in the bullpen next to him had "thrown piss on him" and that the CCDOC had confirmed ULMER's account to her. MUNOZ also reviewed ULMER's diagnostic and medication history, including his risperidone prescription.

49.  On the morning of June 20, 2024, when ULMER was discharged from the CERMAK HEALTH SERVICES urgent care after his initial screenings, no provider had recorded any signs of injury on ULMER's head, wrists, ankles, or anywhere else on his body.

50.  At no time during these assessments of ULMER did TRANI, KHAN, MUNOZ, or BALAWENDER note concerns regarding drug/alcohol abuse or suicidal/homicidal ideation.

51.  After these initial assessments, ULMER's classification was upgraded from "P3" to "P4" (the highest level). ULMER was scheduled to be admitted to P4 housing in the Psychiatric Specialty Care Unit of Cermak (PCSU) for "stabilization and med restart."

52.  The PSCU provides 24-hour nursing and mental health staff, and detainees housed in the PSCU are exempt from discipline inside of the Jail.

53.  Despite ULMER'S known mental health diagnoses and his upgrade from a P3 to P4, no CERMAK HEALTH SERVICES provider prescribed or administered any treatment to ULMER on June 20, 2024, to address his acute psychiatric symptoms.

54.  If antipsychotic medications such as risperidone are stopped suddenly, symptoms such as anxiety, agitation, insomnia, hallucinations, and rebound psychosis can occur.

55.  After this intake medical screening process, each of the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS who interacted with ULMER knew or should have known his medical needs and that he had been given a psychiatric classification requiring the highest level of care and constant monitoring.

56.  However, throughout June 20, 2024, and June 21, 2024, ULMER was not housed in the PSCU but instead kept in the bullpen in the basement of CERMAK HEALTH SERVICES adjacent to its emergency room/urgent care area. ULMER was detained in a small holding cell that lacked sleeping facilities, a toilet, and a sink.

57.     During this two-day period, ULMER was restrained with handcuffs, leg shackles, or a combination of both, even though no good penological or medical reason existed to force ULMER to endure bodily restraints when ULMER was alone in a secure holding cell. The restraints on ULMER were so tight as to cause injury and impair normal blood flow, causing pain, swelling, bruising, lacerations, and circulatory compromise in his extremities.

58.     At approximately 12:35 PM on June 20, SOUMYA JAMES, R.N. administered the first and only dose of metformin that ULMER received during his two days at the Jail.

59.     At some unknown time prior to 3:00 PM on June 20, 2024, ULMER was placed in steel handcuffs.

60.     Around 8:00 PM on June 20, 2024, ULMER repeatedly tried to speak with an unknown individual outside of his cell. Approximately fifteen minutes later, ULMER eliminated waste on the floor of his cell.

61.     Several minutes later, at approximately 8:16 PM, several correctional officers, including OFFICER CODD, shackled ULMER's left leg to the bench in his cell. A correctional officer cleaned the feces from the floor and exited the cell without removing ULMER's handcuffs or leg shackle.

62.     OFFICER CODD and the other correctional officers left ULMER shackled to the bench for hours in retaliation or as punishment for ULMER's act of eliminating on the floor.

63.     There was no legitimate non-punitive purpose for these restraints, which were not applied to prevent self-injury, injury to others, property damage, or other dangerous behavior, nor were they applied to control ULMER during movement and transportation.

64.     During this incident on June 20, 2024, SERGEANT REYES was the Building Sergeant supervising OFFICER CODD and the other correctional officers assigned to CERMAK

HEALTH SERVICES. On this date, SERGEANT REYES had contact with ULMER and knew that ULMER was a P4.

65. At approximately 9:35 PM on June 20, 2024, Mental Health Specialist ANITA JOHNSON entered a note stating ULMER was awaiting transfer to the PSCU and was currently housed in the CERMAK HEALTH SERVICES staging area. JOHNSON indicated that mental health services would continue to monitor ULMER. JOHNSON does not state that she actually saw, spoke to, or assessed ULMER, nor does she mention his restraints.

66. Between June 20, 2024, and June 21, 2024, every one of the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS who observed, monitored, or interacted with ULMER while he was restrained knew or should have known that the prolonged use of tight restraints posed a serious risk of physical harm, especially for a diabetic. Despite this, these Defendants failed to loosen, remove, or seek individuals to medically assess the restraints.

67. At approximately 5:24 AM on June 21, 2024, ULMER's leg shackles were removed, and he was escorted to the bathroom. Approximately twenty minutes later, ULMER was brought back to his cell by five correctional officers, with a sixth officer bringing shackles. ULMER's leg shackles were re-applied, and his handcuffs were removed.

68. Upon ULMER's return from the bathroom, he exhibited behavior that was classified as "bizarre," such as dancing in his cell. Around 6:07 AM, correctional officers entered Ulmer's cell, again handcuffed him, and removed his leg shackles. After a conversation, officers then shackled ULMER's leg to the bench of his cell.

69. ULMER exhibited signs that these restraints were causing him significant pain. ULMER performed actions such as attempting to slide his handcuffs off his wrists, chewing on his handcuffs, laying and rolling on the ground, and knocking on his cell wall.

70.     Around 6:53 AM on June 21, 2024, several correctional officers—including OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA—entered ULMER's cell and removed his handcuffs. After a brief discussion, these correctional officers again handcuffed ULMER and removed his leg shackles.

71.     OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA removed ULMER from the holding cell and escorted him out of the bullpen holding area at 6:56 AM.

72.     There is only one surveillance camera in the emergency room/urgent care area of CERMAK HEALTH SERVICES, which faces toward the door leading into the bullpen.

73.     It is widespread knowledge among the COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES employees at the Jail that there are no surveillance cameras recording the emergency room of CERMAK HEALTH SERVICES beyond a small area near the entry door.

74.     At approximately 6:57 AM, OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA brought ULMER back toward his cell. These officers used or were witness to the application of excessive force, causing ULMER to fall to the ground and strike his head on a metal pole outside of the cell wall. As ULMER lay on the ground, OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA dragged him back into his cell and secured the door.

75.     During the autopsy performed after ULMER's death, the Cook County Medical Examiner found that ULMER had suffered a subarachnoid brain hemorrhage and a hemorrhage in the soft tissue under the skin of his head.

76.     This brain bleed constituted a serious and life-threatening medical emergency. Common symptoms of a subarachnoid brain hemorrhage include severe "thunderclap" headaches, decreased consciousness and alertness, mood and personality changes, eye discomfort in bright light, and muscle aches.

77.     OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, and other COOK COUNTY SHERIFF employees failed to report this use of force.

78.     OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA acted with an intentional disregard for ULMER's safety and well-being by failing to report ULMER's fall and head injury so he could receive medical treatment.

79.     As a pre-trial detainee, ULMER was entirely dependent on the Defendants for his medical and psychiatric care and well-being. ULMER could not seek outside sources of aid.

80.     After the 6:57 AM use-of-force incident, OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA failed to remove the leg shackle that remained secured to the bench in ULMER's cell.

81.     Between approximately 6:57 AM and 3:14 PM on June 21, 2024, ULMER remained handcuffed in the bullpen holding cell.

82.     At approximately 8:19 AM on June 21, 2024, MUNOZ reported that ULMER had "no due psych meds" even though no psychotropic medication had been prescribed. MUNOZ did not record any notes indicating that she actually spoke to or assessed ULMER on June 21, 2024.

83.     About three hours later, around 11:00 AM, BALAWENDER reported performing a new patient evaluation on ULMER. Due to "unpredictable and aggressive behaviors," BALAWENDER spoke to ULMER while he was in his cell in the bullpen. BALAWENDER reported that ULMER was "minimally cooperative" with the interview, was confused about the date, and was having auditory hallucinations.

84.     BALAWENDER ordered ULMER be given risperidone and Depakote. BALAWENDER also ordered that a "B52" sedative injection containing lorazepam, diphenhydramine, and haloperidol be administered to ULMER PRN (as needed).

BALAWENDER did not determine or state in writing whether ULMER had the capacity to make a reasoned decision about receiving this medication, nor what information she provided him.

85.     ULMER was not administered risperidone or any other treatment after BALAWENDER's evaluation, despite obvious signs that his mental state was deteriorating.

86.     On or around 3:15 PM, SERGEANT REYES performed his initial rounds and observed some garbage in ULMER's cell, as well as the shackle attached to the bench that was left behind that morning by OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA.

87.     SERGEANT REYES called for assistance from the other correctional officers assigned to the holding cells—namely, OFFICER ALVAREZ, OFFICER CODD, and OFFICER MATANIC—to remove these items from ULMER's cell.

88.     SERGEANT REYES was wearing a body-worn camera when he entered ULMER's cell (Axon BWC X60A6881H). This body-worn camera was recording video, but SERGEANT REYES had muted the audio.

89.     When SERGEANT REYES, OFFICER ALVAREZ, OFFICER CODD, and OFFICER MATANIC approached, ULMER was sitting on the bench closest to the cell door in a hunched position. ULMER moved to the rear of the cell and cowered as the officers entered. OFFICER ALVAREZ, OFFICER CODD, and OFFICER MATANIC held ULMER as SERGEANT REYES removed the shackle from the bench. As the officers left the cell, ULMER attempted to exit behind them.

90.     SERGEANT REYES, OFFICER ALVAREZ, OFFICER CODD, and OFFICER MATANIC tackled ULMER to the floor. OFFICER RAJKOWSKI, OFFICER ROMO, OFFICER LESNICKI responded to assist. The officers rolled ULMER onto his stomach and placed leg

shackles on him. At this time, SERGEANT REYES unmuted his body-worn camera. Nurse SHEEHAN entered the bullpen and stood nearby watching.

91.     The officers pulled ULMER to his knees. SERGEANT REYES gripped ULMER by the sides of his neck and ordered OFFICER ALVAREZ to bring a restraint chair.

92.     SERGEANT REYES ordered the officers to "drag" ULMER to the nearby emergency room area approximately 20 feet across the concrete floor to CERMAK HEALTH SERVICES. SERGEANT REYES, OFFICER RAJKOWSKI, OFFICER CODD, OFFICER MATANIC, and OFFICER LESNICKI dragged ULMER approximately twenty feet across the concrete floor, causing his shirt to pull up and exposing his bare skin to the floor.

93.     During the time ULMER was unable to stand and/or passively resisting, SERGEANT REYES issued commands almost exclusively to the other officers, not to ULMER.

94.     Upon entering the emergency room of CERMAK HEALTH SERVICES, SERGEANT REYES deactivated his body-worn camera. Before the available BWC ends at timestamp 2024-06-21 15:18:36, the video shows the correctional officers releasing ULMER and standing up as ULMER lies motionless on the floor, while Nurse SHEEHAN stands nearby.

95.     SERGEANT REYES later told Illinois State Police investigators that he had turned his camera off "for privacy reasons of medical patients" as they entered the CERMAK HEALTH SERVICES emergency room. SERGEANT REYES claimed this action was "normal protocol."

96.     OFFICER ALVAREZ and OFFICER ROMO brought the restraint chair into the CERMAK HEALTH SERVICES emergency room approximately ten seconds later. OFFICER JACKSON and OFFICER O'HEARN responded to the radio call of SERGEANT REYES shortly after SERGEANT REYES turned off his body-worn camera.

97.     At approximately 3:20 PM, the correctional officers pulled ULMER away from the door and to the rear of the CERMAK HEALTH SERVICES emergency room area, out of view of the single security camera.

98.     At this time, ULMER yelled that he needed a doctor.

99.     Several of the SHERIFF'S OFFICER DEFENDANTS, including SERGEANT REYES, OFFICER MATANIC, OFFICER JACKSON, and OFFICER O'HEARN, proceeded to beat ULMER while he was handcuffed and shackled on the ground. SERGEANT REYES kicked and hit ULMER with closed fists. OFFICER JACKSON kicked ULMER in the head numerous times, punched ULMER in the head, and hit ULMER in the abdomen with his knee. OFFICER O'HEARN struck ULMER in the leg. Nurse SHEEHAN witnessed this abuse of ULMER and moved around the corner, out of view.

100.    Around this time, OFFICER NOVAK, OFFICER PRETO, OFFICER KAVANAUGH, and Nurse BUNMI OMODARA, R.N. arrived on scene.

101.    When Illinois State Police investigators questioned SERGEANT REYES as to why he did not reactivate his body-worn camera, SERGEANT REYES told them that ULMER had head-butted off his body-worn camera. SERGEANT REYES initially reported that he did not know where the BWC had gone after ULMER had knocked it off his chest. Later, SERGEANT REYES stated he had found the body-worn camera on the floor under a gurney in the ER.

102.    A General Progress Report filled out during the COOK COUNTY SHERIFF's internal investigation of ULMER's in-custody death on June 21, 2024, by Officer Gina Perez #6350 states that the BWC of SERGEANT REYES for 1521-36 hours was reviewed. The handwritten note provides: "UOF grabs ofc. He's secured and brought into restraint chair.

(X60A6881H) breathing fine." The COOK COUNTY SHERIFF did not provide this second BWC video to the Illinois State Police.

103.    After SERGEANT REYES and the other officers beat ULMER, SERGEANT REYES called Nurse SHEEHAN back into the room. SERGEANT REYES stated that he believed ULMER needed emergency medication.

104.    At approximately 3:29 PM, Nurse SHEEHAN spoke with YASER HAQ, M.D., who ordered that ULMER be injected with a "B52" cocktail of intramuscular sedatives that included haloperidol, lorazepam, and diphenhydramine. HAQ did not observe or witness ULMER's condition, yet authorized an injection be administered. HAQ did not order or evaluate care and treatment for the brutality that occurred but instead turned a blind eye to the conduct.

105.    Nurse SHEEHAN injected ULMER's buttocks with this medication and the officers placed ULMER in a restraint chair.

106.    After the shot was administered, ULMER was limp "like a ragdoll" and foaming at the mouth.

107.    The Ward Clerk of CERMAK HEALTH SERVICES called 9-1-1 at approximately 3:38 PM. ULMER was removed from the restraint chair and placed on a stretcher.

108.    SERGEANT REYES, the supervising officer and primary handling sworn member, failed to contact EMS or relay information to EMS personnel, the Cook County Communications Center, or other COOK COUNTY SHERIFF personnel at the Jail to ensure an appropriate and timely emergency response and failed to notify medical personnel that ULMER had been beaten.

109.    On June 21, 2024, at approximately 3:39 PM, the Chicago Fire Department dispatched Ambulance 67 to the Jail. They arrived at 3:46 PM. The Chicago Fire Department Ambulance was delayed outside the entrance gate to Division 8, and upon their entrance past the

first gate, they were delayed again as COOK COUNTY SHERIFF employees radioed for ULMER's location. CFD paramedics did not reach ULMER until approximately 4:01 PM, more than twenty minutes after 9-1-1 had been activated.

110. CERMAK HEALTH SERVICES employee Defendants TAWADROS, SHEEHAN, COLON, OMODARA, and JOHNSON observed and/or responded to the SHERIFF OFFICER DEFENDANTS' actions between 3:20 and 4:10 P.M. on June 21, 2024.

111. OFFICER PRETO, OFFICER O'HEARN, OFFICER RAJKOWSKI, OFFICER KAVANAUGH, and/or OFFICER LESNICKI assisted medical staff.

112. TAWADROS had worked a 24-hour shift prior to this occurrence, which impacted his medical judgment, skill, and ability.

113. At 4:17 PM, Chicago Fire Department's paramedics transported ULMER from the Jail to Mount Sinai Hospital. They arrived at 4:22 PM, and ULMER was pronounced deceased just five minutes later, at 4:27 PM on June 21, 2024.

114. SERGEANT REYES notified COOK COUNTY SHERIFF through EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and/or ASSISTANT DIRECTOR HOLLIS. SERGEANT REYES was ordered to dock his body-worn camera and start a report.

115. SERGEANT REYES reviewed his body-worn camera before writing the report.

116. Providers at Mount Sinai Hospital charted most notes from their encounter with ULMER on paper. Mount Sinai Hospital, through its records transmittal service MRO, failed to produce the copies of the paper copies charts despite receiving all authorizations and details.

117. Around 8:42 PM, Defendant LIEUTENANT KELLY instructed the COOK COUNTY SHERIFF Officers at ULMER's bedside and Mount Sinai Hospital staff that ULMER should not be transported down to the morgue, as there had been a previous incident where an

inmate was placed in the morgue and "someone removed the body from the back entrance." LIEUTENANT KELLY requested "one more hour" before ULMER's body was transported. At approximately 10:00 PM, ASSISTANT DIRECTOR HOLLIS repeated the order that ULMER should not be brought to the morgue.

118.    The Cook County Medical Examiner was not contacted by any of the law enforcement officers present but instead was contacted by Mount Sinai Hospital Registered Nurse Susan Cazares around 10:23 PM, after she repeatedly followed up with the COOK COUNTY SHERIFF's officers about reporting ULMER's death and bringing his body to the morgue.

119.    This delay violated the Cook County Code, Sec. 38-118, which mandated ULMER's in-custody death shall be investigated by the Cook County Medical Examiner, and Sec. 38-121, which requires law enforcement officers, physicians, nurses, and ambulance attendants to report any such death "immediately," or within one hour of their becoming aware of the death.

120.    ULMER was not transported to the Mount Sinai Hospital morgue until approximately 11:16 PM—almost seven hours after he was pronounced deceased.

121.    Defendants LIEUTENANT KELLY and ASSISTANT DIRECTOR HOLLIS obstructed the medical providers of Mount Sinai Hospital from timely transporting ULMER's body to the morgue, which interfered with the posthumous investigation and autopsy findings.

122.    Due to this delayed notification, Cook County Medical Examiner Medicolegal Death Investigator Kayla Ferradino #78 did not arrive at the Mount Sinai Hospital morgue until 11:40 PM. Ferradino observed ULMER's body and reported that his wrists and ankles had lacerations and that his high right knee had an abrasion.

123.     Ferradino arrived at the Jail at 12:24 AM on June 22, 2024. CERMAK HEALTH SERVICES staff informed Ferradino that the scene had already been cleared, including the blood found, but Illinois State Police had documented the scene prior to her arrival.

124.     The Cook County Medical Examiner ruled the manner of death as a homicide due to it being partially caused by the volitional acts of someone else.

125.     Information reported to Illinois State Police and the Cook County Medical Examiner by involved COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES employees was conflicting and/or inconsistent regarding timing, sequence, medical treatment rendered, use of force, and use of restraints.

126.     The autopsy noted a blunt-force injury to ULMER's head. Approximately 5 inches above ULMER's right ear, a 0.5 inch linear abrasion was found, along with a 4 inch by 2 inch contusion on the surrounding scalp. The injury on ULMER's head was consistent with reported blunt force injury which happened earlier on the day of his death. A neuropathology consultation revealed a 6.9 cm by 5.4 cm acute subarachnoid hemorrhage on ULMER's brain but incorrectly lists the injury as having occurred after ULMER "fell and bumped head on wall 2 days prior."

127.     The autopsy indicated injuries to ULMER's left and right wrists, including 0.7 inch black lacerations and contusions in circumferential fashion, and 0.3 inch abrasions and contusions around ULMER's left and right ankles. Soft tissue hemorrhages were identified on ULMER's right and left shoulders, wrists, and ankles; however, measurements of the size of these injuries were not provided in the autopsy.

## CAUSES OF ACTION

### Count I – FOURTEENTH AMENDMENT VIOLATIONS 42 U.S.C. § 1983
### (Use of Excessive/Deadly Force)
### Against SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH

128.    Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

129.    As described more fully above, the conduct of SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH constituted excessive and objectively unreasonable force in violation of the rights guaranteed to ULMER under the Fourteenth Amendment.

130.    These SHERIFF'S OFFICER DEFENDANTS intentionally used force on ULMER for the purpose of harming and punishing him, not in a good faith effort to maintain or restore security or order.

131.    These SHERIFF'S OFFICER DEFENDANTS knew their use of force was excessive and attempted to hide their actions by performing them outside the view of surveillance cameras and failing to accurately report the use of force incidents.

132.    During the first use of force incident that occurred around 6:57 AM on June 21, 2024, ULMER was in handcuffs.

133.    During the second use of force incident that occurred around 3:20 PM on June 21, 2024, ULMER was in handcuffs and leg shackles.

134.    The handcuffs and leg shackles placed on ULMER were too tight, which caused contusions and abrasions to each of his wrists and ankles and constituted excessive force.

24

135.    There was a substantial risk of serious harm to ULMER that could have been eliminated through reasonable and available measures that the SHERIFF'S OFFICER DEFENDANTS did not take, thus causing the injuries ULMER suffered and his death.

136.    OFFICER GARCIA, OFFICER SPRAYBERRY, and OFFICER DAVIS created or increased the danger faced by ULMER by causing and failing to report his traumatic head injury, an event that was likely to have caused cognitive changes and extreme pain.

137.    The actions of the SHERIFF'S OFFICER DEFENDANTS, described hereinabove, injured ULMER in a way unjustified by any governmental interest.

138.    The actions of the SHERIFF'S OFFICER DEFENDANTS, described hereinabove, shock the conscience.

139.    Each of the SHERIFF'S OFFICER DEFENDANTS caused or participated in the constitutional deprivation.

140.    As a direct and proximate result of the SHERIFF'S OFFICER DEFENDANTS' unlawful, unjustified, and unconstitutional actions, ULMER suffered physical harm, physical pain and discomfort, emotional distress, and death.

141.    In addition to compensatory damages, Plaintiff will also seek to recover, under 42 U.S.C. § 1988, attorney's fees and costs incurred during the course of this litigation.

142.    The actions of SHERIFF'S OFFICER DEFENDANTS were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to ULMER, thereby justifying an award of punitive damages.

**Count II - FOURTEENTH AMENDMENT VIOLATIONS 42 U.S.C. § 1983**
**(Failure to Intervene/Failure to Protect/Bystander Liability)**

**Against SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER**

**PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, OFFICER KAVANAUGH, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, HAQ, and TAWADROS**

143.     Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

144.     As referenced in facts common to all counts and described in Count I above, Defendants SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH used excessive force on ULMER by beating him and subjecting him to prolonged periods of tight restraints for the purpose of harming him and punishing him.

145.     Each of the Defendants named in this Count knew that ULMER was being subjected to prolonged periods of bodily restraint without a good medical or penological reason.

146.     OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA each knew that ULMER had been subjected to a use of force which caused a head injury.

147.     OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, OFFICER KAVANAUGH, and SERGEANT REYES knew that the other officers were using or were about to use excessive force on ULMER in the emergency room area of CERMAK HEALTH SERVICES.

148.     COLON, JOHNSON, OMODARA, SHEEHAN, HAQ, and TAWADROS knew that the officers were using or were about to use excessive force on ULMER in the emergency room area of CERMAK HEALTH SERVICES.

149.     During the events described above, the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS named in this Count failed to intervene to prevent the

violation of ULMER's constitutional rights under the Fourteenth Amendment, even though they had the opportunity and duty to do so. Each of these Defendants failed to take reasonable steps to stop the SHERIFF'S OFFICER DEFENDANTS who summarily punished ULMER in their presence or otherwise within their knowledge.

150.    As a direct and proximate result of the SHERIFF'S OFFICER DEFENDANTS' and CERMAK HEALTH DEFENDANTS' unlawful, unjustified, and unconstitutional actions, ULMER suffered a deprivation of his Constitutional rights and physical harm, physical pain and discomfort, emotional distress, and death.

151.    In addition to compensatory damages, Plaintiff will also seek to recover, under 42 U.S.C. § 1988, attorney's fees and costs incurred during the course of this litigation.

152.    The actions of SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to ULMER, thereby justifying an award of punitive damages.

### Count III - FOURTEENTH AMENDMENT VIOLATIONS 42 U.S.C. § 1983
### (Delay/Denial of Medical Care)
**Against SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, OFFICER KAVANAUGH, TRANI, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, KHAN, HAQ, and TAWADROS**

153.    Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

154.    At all relevant times, the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS were responsible for the care and humane treatment of detainees at the Cook County Jail.

155.    ULMER, as a pre-trial detainee, had the constitutional right to adequate medical care under the Fourteenth Amendment's Due Process Clause.

156. The SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS named in this count, while acting under color of law and within the scope of their employment, had actual knowledge of ULMER's serious medical needs and injuries.

157. The SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS had actual knowledge that ULMER had type-2 diabetes and an elevated blood pressure reading, both of which are objectively serious medical needs.

158. The SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS had actual knowledge that ULMER had been classified as a "P4," which is the highest classification and is reserved for detainees with acute care needs requiring a medication and a daily care plan.

159. ULMER had an objectively serious medical need in that his psychiatric crisis was so obvious that even someone who is not a doctor would recognize that it required treatment.

160. ULMER had an objectively serious medical need in that he had suffered a traumatic brain injury on June 21, 2024, which was a life-threatening emergency requiring immediate medical treatment.

161. Multiple CERMAK HEALTH DEFENDANTS, including MUNOZ, JOHNSON, BALAWENDER, SHEEHAN, OMODARA, TAWADROS, and HAQ, were working at CERMAK HEALTH SERVICES on June 21, 2024, and were aware of ULMER, yet failed to monitor and ignored signs that ULMER had suffered a significant head injury.

162. The SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS responded to ULMER's behavior—including behavior that was completely harmless, such as dancing in his cell—by punishing him with restraints, or by turning a blind eye to restraint use, instead of providing mental health treatment.

163.    ULMER told the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS that he needed a doctor, but his request was ignored.

164.    The failure of the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS to provide ULMER with necessary medical care caused his physical and mental condition to deteriorate to a dangerous condition.

165.    SERGEANT REYES, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, OFFICER KAVANAUGH, COLON, JOHNSON, OMODARA, SHEEHAN, HAQ, and TAWADROS, knew or should have known that ULMER required emergency medical care and transportation to a hospital for the injuries he sustained during the brutal beating he received in the CERMAK HEALTH SERVICES urgent care area.

166.    These delays in medical treatment directly led to and/or were a significant cause of ULMER's death.

167.    Had the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS provided ULMER with necessary medical treatment and/or failed to refrain from injuring ULMER with excessive force, his odds for recovery or survival would have improved.

168.    As a direct and proximate result of the SHERIFF'S OFFICER DEFENDANTS' and CERMAK HEALTH DEFENDANTS' unlawful, unjustified, and unconstitutional actions, ULMER suffered a deprivation of his Constitutional rights and physical harm, physical pain and discomfort, emotional distress, and death.

169.    In addition to compensatory damages, Plaintiff will also seek to recover, under 42 U.S.C. § 1988, attorney's fees and costs incurred during the course of this litigation.

170.     The actions of the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to ULMER, thereby justifying an award of punitive damages.

**Count IV - FOURTEENTH AMENDMENT VIOLATIONS 42 U.S.C. § 1983
(Punishment Without Due Process/Conditions of Confinement)
Against SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER
GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER
JACKSON, OFFICER LESNICKI, OFFICER O'HEARN,
OFFICER RAJKOWSKI, and OFFICER ROMO**

171.     Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

172.     At all relevant times, as a pretrial detainee, ULMER was entitled to the minimal civilized measures of life's necessities, including reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities.

173.     During the 36 hours that ULMER spent at the Jail, he was confined in a holding cell that lacked a bed, toilet, and a sink due to overcrowding, mismanagement, and negligent oversight of the Jail.

174.     As described above, ULMER spent most or all of his time within this cell restrained by handcuffs, leg shackles, or both, including long periods where he was shackled to the bench.

175.     These inhumane conditions served to deprive ULMER of sleep.

176.     ULMER was given limited bathroom access during the 36-hour period he was confined at the Jail. When ULMER eliminated waste on the floor the holding cell, which lacked a toilet, the SHERIFF'S OFFICER DEFENDANTS, including OFFICER CODD and SERGEANT REYES, punished ULMER by shackling his leg to the rear bench.

177.     Because the holding cell lacked a sink, ULMER had limited access to drinking water during the time he was detained at the Jail. ULMER was dehydrated upon his admission to the Jail after spending significant time outside exposed to hot weather on June 20, 2024.

178.     ULMER had no access to sanitation, toiletries, or other hygienic materials during his confinement, which was exacerbated by the fact the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS were aware another detainee had "thrown piss on" ULMER shortly after his admission to the Jail.

179.     These conditions of confinement were objectively unreasonable and excessive in relation to any legitimate non-punitive purpose.

180.     These conditions of confinement, whether alone or in combination with the other constitutional violations alleged above, worsened the mental health issues ULMER was experiencing when he was booked into the Jail and subjected ULMER to a strong likelihood of serious harm.

181.     Defendants SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER RAJKOWSKI, and OFFICER ROMO were each aware of the strong likelihood that ULMER would be seriously harmed due to the effects of the serious deprivation of his basic human needs.

182.     Each of the Defendants named in this Count consciously failed to take reasonable measures to prevent additional harm from occurring. ULMER would not have been harmed or would have suffered less harm if the Defendants named in this Count had taken reasonable measures to mitigate the adverse conditions.

183.     As a direct and proximate result of these SHERIFF'S OFFICER DEFENDANTS' unlawful, unjustified, and unconstitutional actions, ULMER suffered physical harm, physical pain, discomfort, emotional distress, and death.

184.     In addition to compensatory damages, Plaintiff will also seek to recover, under 42 U.S.C. § 1988, attorney's fees and costs incurred during the course of this litigation.

185.     The actions of these SHERIFF'S OFFICER DEFENDANTS were reprehensible, willful and wanton, malicious, and in blatant disregard for the rights owed to ULMER, thereby justifying an award of punitive damages.

**Count V – State Law Wrongful Death**
**(Willful and Wanton Misconduct / Negligence)**
**Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

186.     Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

187.     Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action on behalf of ULMER's next-of-kin pursuant to the Wrongful Death Act, 740 ILCS 180/1, *et seq*.

188.     At all relevant times, Defendants SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH were duly authorized actual and/or apparent agents and employees of the COOK COUNTY SHERIFF acting within the scope of their employment.

189.     The acts of the SHERIFF'S OFFICER DEFENDANTS are directly chargeable to the COOK COUNTY SHERIFF under state law pursuant to *respondeat superior*.

190.    At all relevant times, the COOK COUNTY SHERIFF, by and through its individual employees and agents, owed ULMER a duty not to engage in willful and wanton conduct which would endanger the safety of ULMER.

191.    At all relevant times, based on the custodial relationship, the COOK COUNTY SHERIFF's agents and employees, including the Defendants named in this Count, were under a duty to provide for the health, safety, and access to competent medical care to treat the serious medical needs of pre-trial detainees at the Jail.

192.    Between June 20, 2024, and June 21, 2024, the Defendants named in this Count breached their duty of care, were grossly negligent, and/or acted with reckless misconduct in one or more of the following ways, causing damages and harm:

   (a)    Willfully and wantonly failing to adequately monitor ULMER and perform well-being checks while he was detained at the Jail as a P4 psychiatric patient on June 20, 2024, and June 21, 2024;

   (b)    Willfully and wantonly failing to treat ULMER humanely while he was detained in the Jail and provide him with proper food, hydration, bathroom access, sleeping facilities, and shelter;

   (c)    Willfully and wantonly failing to take reasonable action to summon medical care after observing that ULMER was in need of immediate medical care;

   (d)    Willfully and wantonly failing to notify medical staff that ULMER had sustained a blow to the head;

   (e)    Willfully and wantonly failing to reasonably summon mental health care for ULMER in light of his deteriorating mental state;

   (f)    Willfully and wantonly ignoring ULMER's symptoms of distress;

   (g)    Willfully and wantonly ignoring the lack of adequate medical care that ULMER was receiving from the CERMAK HEALTH DEFENDANTS;

   (h)    Willfully and wantonly failing to remove ULMER's restraints;

   (i)    Willfully and wantonly failing to report and document uses of force and restraints, or knowingly reporting these incidents inaccurately and untruthfully;

(j)     Willfully and wantonly failing to recognize that the severity of ULMER's symptoms could not be properly managed in a holding cell in the basement of CERMAK HEALTH SERVICES;

(k)     Willfully and wantonly failing to contact 9-1-1 or transfer ULMER to a hospital to receive timely and necessary treatment after he sustained injuries due to the uses of force;

(l)     Willfully and wantonly failing to coordinate with other COOK COUNTY SHERIFF personnel and EMS to ensure paramedics could timely reach ULMER in CERMAK HEALTH SERVICES when he required emergency lifesaving care;

(m)     Willfully and wantonly failing to inform medical personnel treating ULMER that he had been subjected to force;

(n)     Willfully failing to provide adequate emergency care to ULMER in a timely manner; and/or

(o)     Otherwise acting willfully and wantonly toward ULMER, in total, reckless, and malicious disregard of his medical needs.

193.    As a direct and proximate result of one or more of the foregoing willful and wanton acts or omissions of the Defendants named in this Count, ULMER died on June 21, 2024.

194.    As a direct and proximate result of ULMER's death, ULMER's next-of-kin have suffered damages, including but not limited to loss of ULMER's companionship, guidance, advice, love, affection, and society; grief, sorrow, and mental anguish; funeral and burial expenses; and such other damages as may be proven at trial.

**Count VI – State Law Survival**
**(Willful and Wanton Misconduct / Negligence)**
**Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

195.    Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

196.    Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

197.    At all relevant times, Defendants SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH were duly authorized actual and/or apparent agents and employees of the COOK COUNTY SHERIFF acting within the scope of their employment.

198.    The acts of the SHERIFF'S OFFICER DEFENDANTS are directly chargeable to the COOK COUNTY SHERIFF under state law pursuant to *respondeat superior.*

199.    At all relevant times, the COOK COUNTY SHERIFF, by and through its individual employees and agents, owed ULMER a duty not to engage in willful and wanton conduct which would endanger the safety of ULMER.

200.    At all relevant times, based on the custodial relationship, the COOK COUNTY SHERIFF's agents and employees, including the Defendants named in this Count, were under a duty to provide for the health, safety, and access to competent medical care to treat the serious medical needs of pre-trial detainees at the Jail.

201.    Between June 20, 2024, and June 21, 2024, the Defendants named in this Count breached their duty of care, were grossly negligent, and/or acted with reckless misconduct in one or more of the following ways, causing damages and harm:

(a)    Willfully and wantonly failing to adequately monitor ULMER and perform well-being checks while he was detained at the Jail as a P4 psychiatric patient on June 20, 2024, and June 21, 2024;

(b)    Willfully and wantonly failing to treat ULMER humanely while he was detained in the Jail and provide him with proper food, hydration, bathroom access, sleeping facilities, and shelter;

(c)    Willfully and wantonly failing to take reasonable action to summon medical care after observing that ULMER was in need of immediate medical care;

(d)     Willfully and wantonly failing to notify medical staff that ULMER had sustained a blow to the head;

(e)     Willfully and wantonly failing to reasonably summon mental health care for ULMER in light of his deteriorating mental state;

(f)     Willfully and wantonly ignoring ULMER's symptoms of distress;

(g)     Willfully and wantonly ignoring the lack of adequate medical care that ULMER was receiving from the CERMAK HEALTH DEFENDANTS;

(h)     Willfully and wantonly failing to remove ULMER's restraints;

(i)     Willfully and wantonly failing to report and document uses of force and restraints, or knowingly reporting these incidents inaccurately and untruthfully;

(j)     Willfully and wantonly failing to recognize that the severity of ULMER's symptoms could not be properly managed in a holding cell in the basement of CERMAK HEALTH SERVICES;

(k)     Willfully and wantonly failing to contact 9-1-1 or transfer ULMER to a hospital to receive timely and necessary treatment after he sustained injuries due to the uses of force;

(l)     Willfully and wantonly failing to coordinate with other COOK COUNTY SHERIFF personnel and EMS to ensure paramedics could timely reach ULMER in CERMAK HEALTH SERVICES when he required emergency lifesaving care;

(m)     Willfully and wantonly failing to inform medical personnel treating ULMER that he had been subjected to force;

(n)     Willfully failing to provide adequate emergency care to ULMER in a timely manner; and/or

(o)     Otherwise acting willfully and wantonly toward ULMER, in total, reckless, and malicious disregard of his medical needs.

202.    As a direct and proximate result of one or more of the foregoing willful and wanton acts or omissions of the Defendants named in this Count, ULMER suffered injuries and died on June 21, 2024.

203.    Prior to his death, ULMER had a viable cause of action against the COOK COUNTY SHERIFF and SHERIFF'S OFFICER DEFENDANTS named in this Count for these

willful and wanton acts and/or omissions. Had ULMER survived, he would have been entitled to bring an action for his damages.

204.     As a direct and proximate result of one or more of the foregoing willful and wanton acts and/or omissions of the Defendants named in this Count, ULMER suffered injures of a personal and pecuniary nature, including but not limited to ULMER's pain and suffering caused by the failure to provide medical care; ULMER's prolonged mental anguish and emotional distress; medical expenses incurred; and such other damages as may be proven at trial.

### Count VII – State Law Wrongful Death
**(Battery)**
**Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

205.     Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

206.     Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action on behalf of ULMER's next-of-kin pursuant to the Wrongful Death Act, 740 ILCS 180/1, *et seq*.

207.     On or about June 21, 2024, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH, individually and in concert with one another, intentionally made harmful and offensive contact with ULMER by applying excessively tight restraints, striking, beating, and otherwise physically assaulting/battering him while he was in handcuffs and leg shackles and posed no threat to officer safety.

208.     At no time did ULMER's actions or passive resistance warrant the use of deadly force, and there was no legal justification for these Defendants' reckless use of force or excessive force. The Defendants named in this Count acted with ill will and actual malice.

209.     The acts of these Defendants are directly chargeable to the COOK COUNTY SHERIFF under state law pursuant to *respondeat superior.*

210.     The actions of the Defendants named in this Count were undertaken without justification, were excessive under the circumstances, and constituted unreasonable force against a detained individual.

211.     These Defendants knew or should have known that their conduct was substantially certain to cause harmful contact to ULMER, and that such contact would be offensive and harmful to a reasonable person.

212.     The Defendants named in this Count struck, hit, punched, kicked, dropped, dragged, and/or slammed ULMER, causing serious injury.

213.     As a direct and proximate result of the battery committed by these Defendants, ULMER sustained severe physical injuries, including but not limited to a blunt force injury of the head resulting in an abrasion and contusion of his scalp and a subarachnoid hemorrhage of his brain; abrasions and contusions around his wrists and ankles; abrasions on his right knee; and soft tissue hemorrhage on his shoulders, abdomen, thigh, wrists, and ankles.

214.     Some or all of the foregoing injuries directly caused or contributed to ULMER's death on June 21, 2024.

215.     As a direct and proximate result of ULMER's death, ULMER's next-of-kin have suffered damages, including but not limited to loss of ULMER's companionship, guidance, advice,

love, affection, and society; grief, sorrow, and mental anguish; funeral and burial expenses; and such other damages as may be proven at trial.

**Count VIII – State Law Survival**
**(Battery)**
**Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

216.    Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

217.    Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

218.    On or about June 21, 2024, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH, individually and in concert with one another, intentionally made harmful and offensive contact with ULMER by applying excessively tight restraints, striking, beating, and otherwise physically assaulting/battering him while he was in handcuffs and leg shackles and posed no threat to officer safety.

219.    At no time did ULMER's actions or passive resistance warrant the use of deadly force, and there was no legal justification for these Defendants' reckless use of force or excessive force. The Defendants named in this Count acted with ill will and actual malice.

220.    The acts of these Defendants are directly chargeable to the COOK COUNTY SHERIFF under state law pursuant to *respondeat superior*.

221. The actions of the Defendants named in this Count were undertaken without justification, were excessive under the circumstances, and constituted unreasonable force against a detained individual.

222. These Defendants knew or should have known that their conduct was substantially certain to cause harmful contact to ULMER, and that such contact would be offensive and harmful to a reasonable person.

223. The Defendants named in this Count struck, hit, punched, kicked, dropped, dragged, and/or slammed ULMER, causing serious injury.

224. As a direct and proximate result of the battery committed by these Defendants, ULMER sustained severe physical injuries, including but not limited to a blunt force injury of the head resulting in an abrasion and contusion of his scalp and a subarachnoid hemorrhage of his brain; abrasions and contusions around his wrists and ankles; abrasions on his right knee; and soft tissue hemorrhage on his shoulders, abdomen, thigh, wrists, and ankles.

225. As a direct and proximate result of SHERIFF'S OFFICER DEFENDANTS' battery, ULMER suffered severe physical pain and mental anguish during the period between the infliction of these injuries and his death on June 21, 2024.

226. Prior to his death, ULMER had a viable cause of action against the COOK COUNTY SHERIFF and Defendants named in this Count for battery. Had ULMER survived, he would have been entitled to bring an action for his damages.

227. As a direct and proximate result of the SHERIFF'S OFFICER DEFENDANTS' intentionally tortious conduct, ULMER suffered injures of a personal and pecuniary nature, including but not limited to ULMER's pain and suffering caused by the failure to provide medical

care; ULMER's prolonged mental anguish and emotional distress; medical expenses incurred; and such other damages as may be proven at trial.

**Count IX – State Law Survival**
**(Intentional Infliction of Emotional Distress)**
**Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

228. Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

229. Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

230. The COOK COUNTY SHERIFF, through SERGENAT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH, knew or should have known ULMER was a P4 patient suffering from severe, untreated mental health issues.

231. The COOK COUNTY SHERIFF, through the Defendants named in this Count, exercised nearly complete control over ULMER's ability to move, sleep, eat, drink, and use the bathroom on June 20, 2024, and June 21, 2024.

232. The conduct of the above-named Defendants toward ULMER, including but not limited to the following, was extreme and outrageous:

(a) Placing ULMER in restraints for extended periods of time;

(b) Shackling ULMER to a bench for extended periods of time;

(c) Keeping ULMER confined in a cell that lacked sleeping or sanitation facilities for extended periods of time;

(d)     Depriving ULMER of water;

(e)     Deliberately withholding bathroom access from ULMER for extended periods of time;

(f)     Subjecting ULMER to an excessive use of force multiple times;

(g)     Failing to report ULMER's severe head injury; and

(h)     Willfully and wantonly failure to provide or summon necessary medical and mental health treatment for ULMER.

233.    The acts of these Defendants are directly chargeable to the COOK COUNTY SHERIFF under state law pursuant to *respondeat superior.*

234.    These Defendants' conduct exceeded all bounds of decency and is utterly intolerable in a civilized society, particularly given their position of authority as correctional officers over a detained and vulnerable individual.

235.    The Defendants engaged in this extreme and outrageous conduct intentionally and/or with reckless disregard for the probability that their actions would cause severe emotional distress to ULMER and/or worsen his mental health crisis.

236.    Prior to his death, ULMER had a viable cause of action against the COOK COUNTY SHERIFF and these Defendants for intentional infliction of emotional distress. Had ULMER survived, he would have been entitled to bring an action for his damages.

237.    As a direct and proximate result of the SHERIFF'S OFFICER DEFENDANTS malicious and intentionally tortious conduct, ULMER suffered injures of a personal and pecuniary nature, including but not limited to extreme fear, terror, and anxiety; humiliation and degradation; mental anguish and psychological trauma; despair and hopelessness caused by SHERIFF'S OFFICER DEFENDANTS' and CERMAK HEALTH DEFENDANTS' refusal to provide medical care; and such other forms of severe emotional distress as may be proven at trial.

**Count X – State Law Wrongful Death**
**(Medical Malpractice)**
**Against COOK COUNTY d/b/a CERMAK HEALTH SERVICES, TRANI, COLON,**
**MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN,**
**KHAN, HAQ, and TAWADROS**

238. Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

239. Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action on behalf of ULMER's next-of-kin pursuant to the Wrongful Death Act, 740 ILCS 180/1, *et seq*.

240. Plaintiff attaches hereto an affidavit and medical report in compliance with 735 ILCS 5/2-622.

241. At all relevant times, TRANI, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, KHAN, HAQ, and TAWADROS are or were actual and/or apparent agents and employees of Defendant COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES acting within the scope of their employment.

242. COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES is vicariously liable for the acts and omissions of its agents and employees.

243. With respect to their care and treatment of ULMER, each of these Defendants owed a duty to exercise reasonable care according to the conditions known to them or that, through reasonable care should have been known to them, in accordance with standards of care in the community of physicians for KHAN, HAQ, and TAWADROS; in the community of nurses for OMODARA, JAMES, and SHEEHAN; in the community of paramedics for TRANI and COLON; in the community of mental health professionals for MUNOZ and JOHNSON; and in the community of physician's assistants for BALAWENDER.

244.    Each of the Defendants named in this Count deviated or fell below the standard of care or practice applicable to providing adequate healthcare to a pre-trial detainee patient under the Fourteenth Amendment, Illinois law, and the common law.

245.    Between June 20, 2024, and June 21, 2024, these Defendants knew or should have known that ULMER was experiencing a psychiatric crisis and required acute psychiatric care in a therapeutic environment.

246.    Between June 20, 2024, and June 21, 2024, the CERMAK HEALTH DEFENDANTS knew or should have known that ULMER was dehydrated, had type-2 diabetes, and was experiencing elevated systolic blood pressure, and therefore required ongoing treatment and monitoring for these serious health concerns.

247.    Between June 20, 2024, and June 21, 2024, these Defendants should have known that many of the symptoms experienced ULMER could be attributed to suddenly stopping risperidone, the psychotropic medication previously prescribed to him by CERMAK HEALTH SERVICES.

248.    The foregoing CERMAK HEALTH DEFENDANTS breached the aforesaid duty to ULMER to exercise reasonable care according to the conditions known to them or that, through reasonable care, should have been known to them, in accordance with the standards of care in their respective professional communities.

249.    Each of the CERMAK HEALTH DEFENDANTS was negligent and deviated from the standard of care in one or more of the following ways:

    (a)    Failing to appropriately enter clinical documentation of the conditions, assessments, interventions, and treatment of ULMER.

    (b)    Failing to ensure the required continuity of care for ULMER's known diagnoses of bipolar disorder and diabetes.

(c)     Failing to administer the psychotropic medication ULMER had been prescribed to treat his bipolar disorder and psychosis.

(d)     Failing to timely treat and remove ULMER from the bullpen and admit ULMER to a heightened care level psychiatric unit, such as the Psychiatric Special Care Unit or other housing such as the Medical Special Care Unit.

(e)     Failing to manage medication or monitor for symptoms of withdrawal from psychotropic medications.

(f)     Mismanaging needed medical attention to reasonably care for ULMER's diabetes and blood pressure.

(g)     Failing to monitor the vital signs, hydration, and nutrition status and needs of ULMER, a known diabetic patient, while he was detained.

(h)     Failing to review or negligently communicating ULMER's medical history with other medical or correctional personnel after transfer to the more restrictive environment, the bullpen, following the diagnosis of his psychosis.

(i)     Failing to adequately provide care, treatment, and medical services to a detained individual with co-morbid medical and psychiatric issues.

(j)     Failing to communicate the severity and urgency of ULMER's psychiatric and medical condition to a physician.

(k)     Failing to consult with appropriate medical professionals.

(l)     Failing to implement the treatment plan that was written in the record.

(m)     Failing to monitor, treat, or render medical care to ULMER during the prolonged periods in which he was restrained and/or shackled, and failing to properly document the use of restraints.

(n)     Were otherwise careless, reckless, negligent, willful and wanton, or objectively unreasonable in the treatment of ULMER.

250.    On June 20, 2024, TRANI, KHAN, BALAWENDER, OMODARA, and MUNOZ

were negligent and deviated from the standard of care in one or more of the following ways:

(a)     Failing to timely complete a full medical history, or perform an appropriate follow-up physical examination, treatment, and medication administration.

(b)     Failing to complete medication reconciliation on entry into the jail.

(c)     Failing to ensure that ULMER was seen on admission by a psychiatrist.

251.    On June 20, 2024, and June 21, 2024, JAMES and SHEEHAN were negligent and deviated from the standard of care by failing ailing to complete the medication administration record for ULMER appropriately.

252.    On June 21, 2024, SHEEHAN, MUNOZ, JOHNSON, BALAWENDER, OMODARA, HAQ, and TAWADROS knew or should have known that ULMER had suffered a traumatic head injury, and were therefore negligent and deviated from the standard of care in one or more of the following ways:

(a)    Failing to evaluate or assess ULMER after a known and visualized blow to the head.

(b)    Failing to recognize or act upon ULMER's new traumatic head injury, which constituted a medical emergency that required immediate emergency medical services.

253.    On June 21, 2024, SHEEHAN, JOHNSON, OMODARA, HAQ, COLON, and TAWADROS were negligent and deviated from the standard of care in one or more of the following ways:

(a)    Failing to monitor ULMER's condition or provide immediate medical assistance after witnessing the correctional officers' use of force, which was likely to cause ULMER harm.

(b)    Administering an emergent antipsychotic injection to ULMER, without appropriate monitoring afterwards.

(c)    Failing to triage during resuscitation efforts, negligently administering advanced life support or defibrillation, and failing to provide records of patient care, treatment, and observation during resuscitation efforts.

254.    On June 20, 2024, and June 21, 2024, KHAN, HAQ, and TAWADROS, as physicians who were responsible for instructing the other medical professionals at CERMAK HEALTH SERVICES, were negligent and deviated from the standard of care by failing to provide

the standard of care, physician oversight of the correctional medical technicians, mental health staff, and nursing staff.

255.    As a direct and proximate result of these Defendants' breach of their duty to protect ULMER from harm and to provide reasonable care and treatment to ULMER, he suffered significant physical and mental pain and distress and other damages, including death.

256.    The negligent and/or willful and wanton and/or objectively unreasonable acts and omissions by these Defendants were a substantial and significant contributing cause of ULMER's death, and it was reasonably foreseeable that the acts or omissions of the Defendant named in this Count would cause the harm or a similar harm that ULMER suffered.

257.    Each of these Defendants knew ULMER faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it. As a direct and proximate result of the foregoing, ULMER was subjected to great physical and emotional pain and suffering, and ultimately death.

258.    Some or all of the foregoing injuries directly caused or contributed to ULMER's death on June 21, 2024.

259.    As a direct and proximate result of ULMER's death, ULMER's next-of-kin have suffered damages, including but not limited to loss of ULMER's companionship, guidance, advice, love, affection, and society; grief, sorrow, and mental anguish; funeral and burial expenses; and such other damages as may be proven at trial.

### Count XI – State Law Survival
### (Medical Malpractice)
### Against COOK COUNTY d/b/a CERMAK HEALTH SERVICES, TRANI, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, KHAN, HAQ, and TAWADROS

260.    Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

261. Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

262. Plaintiff attaches hereto an affidavit and medical report in compliance with 735 ILCS 5/2-622.

263. At all relevant times, TRANI, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, KHAN, HAQ, and TAWADROS are or were actual and/or apparent agents and employees of Defendant COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES acting within the scope of their employment.

264. COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES is vicariously liable for the acts and omissions of its agents and employees.

265. With respect to their care and treatment of ULMER, the CERMAK HEALTH DEFENDANTS owed a duty to exercise reasonable care according to the conditions known to them or that, through reasonable care should have been known to them, in accordance with standards of care in the community of physicians for KHAN, HAQ, and TAWADROS; in the community of nurses for OMODARA, JAMES, and SHEEHAN; in the community of paramedics for TRANI and COLON; in the community of mental health professionals for MUNOZ and JOHNSON; and in the community of physician's assistants for BALAWENDER.

266. Each of the Defendants named in this Count deviated or fell below the standard of care or practice applicable to providing adequate healthcare to a pre-trial detainee patient under the Fourteenth Amendment, Illinois law, and the common law.

267. Between June 20, 2024, and June 21, 2024, each of these Defendants knew or should have known that ULMER was experiencing a psychiatric crisis and required acute psychiatric care in a therapeutic environment.

268.    Between June 20, 2024, and June 21, 2024, these Defendants knew or should have known that ULMER was dehydrated, had type-2 diabetes, and was experiencing elevated systolic blood pressure, and therefore required ongoing treatment and monitoring for these serious health concerns.

269.    Between June 20, 2024, and June 21, 2024, these Defendants should have known that many of the symptoms experienced ULMER could be attributed to suddenly stopping risperidone, the psychotropic medication previously prescribed to him by CERMAK HEALTH SERVICES.

270.    The foregoing CERMAK HEALTH DEFENDANTS breached the aforesaid duty to ULMER to exercise reasonable care according to the conditions known to them or that, through reasonable care, should have been known to them, in accordance with the standards of care in their respective professional communities.

271.    Each of the CERMAK HEALTH DEFENDANTS was negligent and deviated from the standard of care in one or more of the following ways:

(a)    Failing to appropriately enter clinical documentation of the conditions, assessments, interventions, and treatment of ULMER.

(b)    Failing to ensure the required continuity of care for ULMER's known diagnoses of bipolar disorder and diabetes.

(c)    Failing to administer the psychotropic medication ULMER had been prescribed to treat his bipolar disorder and psychosis.

(d)    Failing to timely treat and remove ULMER from the bullpen and admit ULMER to a heightened care level psychiatric unit, such as the Psychiatric Special Care Unit or other housing such as the Medical Special Care Unit.

(e)    Failing to manage medication or monitor for symptoms of withdrawal from psychotropic medications.

(f)    Mismanaging needed medical attention to reasonably care for ULMER's diabetes and blood pressure.

(g)  Failing to monitor the vital signs, hydration, and nutrition status and needs of ULMER, a known diabetic patient, while he was detained.

(h)  Failing to review or negligently communicating ULMER's medical history with other medical or correctional personnel after transfer to the more restrictive environment, the bullpen, following the diagnosis of his psychosis.

(i)  Failing to adequately provide care, treatment, and medical services to a detained individual with co-morbid medical and psychiatric issues.

(j)  Failing to communicate the severity and urgency of ULMER's psychiatric and medical condition to a physician.

(k)  Failing to consult with appropriate medical professionals.

(l)  Failing to implement the treatment plan that was written in the record.

(m)  Failing to monitor, treat, or render medical care to ULMER during the prolonged periods in which he was restrained and/or shackled, and failing to properly document the use of restraints.

(n)  Were otherwise careless, reckless, negligent, willful and wanton, or objectively unreasonable in the treatment of ULMER.

272.  On June 20, 2024, TRANI, KHAN, BALAWENDER, OMODARA, and MUNOZ were negligent and deviated from the standard of care in one or more of the following ways:

(a)  Failing to timely complete a full medical history, or perform an appropriate follow-up physical examination, treatment, and medication administration.

(b)  Failing to complete medication reconciliation on entry into the jail.

(c)  Failing to ensure that ULMER was seen on admission by a psychiatrist.

273.  On June 20, 2024, and June 21, 2024, JAMES and SHEEHAN were negligent and deviated from the standard of care by failing to complete the medication administration record for ULMER appropriately.

274.  On June 21, 2024, SHEEHAN, MUNOZ, JOHNSON, BALAWENDER, OMODARA, HAQ, and TAWADROS knew or should have known that ULMER had suffered a

traumatic head injury, and were therefore negligent and deviated from the standard of care in one or more of the following ways:

      (a)    Failing to evaluate or assess ULMER after a known and visualized blow to the head.

      (b)    Failing to recognize or act upon ULMER's new traumatic head injury, which constituted a medical emergency that required immediate emergency medical services.

275.    On June 21, 2024, SHEEHAN, JOHNSON, OMODARA, HAQ, COLON, and TAWADROS were negligent and deviated from the standard of care in one or more of the following ways:

      (a)    Failing to monitor ULMER's condition or provide immediate medical assistance after witnessing the correctional officers' use of force, which was likely to cause ULMER harm.

      (b)    Administering an emergent antipsychotic injection to ULMER, without appropriate monitoring afterwards.

      (c)    Failing to triage during resuscitation efforts, negligently administering advanced life support or defibrillation, and failing to provide records of patient care, treatment, and observation during resuscitation efforts.

276.    On June 20, 2024, and June 21, 2024, KHAN, HAQ, and TAWADROS, as physicians who were responsible for instructing the other medical professionals at CERMAK HEALTH SERVICES, were negligent and deviated from the standard of care by failing to provide the standard of care, physician oversight of the correctional medical technicians, mental health staff, and nursing staff.

277.    As a direct and proximate result of these Defendants' breach of their duty to protect ULMER from harm and to provide reasonable care and treatment to ULMER, he suffered significant physical and mental pain and distress and other damages, including death.

278.    The negligent and/or willful and wanton and/or objectively unreasonable acts and omissions by the Defendants named in this Count were a substantial and significant contributing cause of ULMER's death, and it was reasonably foreseeable that the CERMAK HEALTH DEFENDANTS' acts or omissions would cause the harm or a similar harm that ULMER suffered.

279.    Each of the said Defendants knew ULMER faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it. As a direct and proximate result of the foregoing, ULMER was subjected to great physical and emotional pain and suffering, and ultimately death.

280.    Prior to his death, ULMER had a viable cause of action against each of the Defendants named in this Count for medical malpractice, and had he survived, he would have been entitled to bring an action for the damages.

281.    As a direct and proximate result of the acts or omissions of these Defendants, ULMER suffered injures of a personal and pecuniary nature, including but not limited to ULMER's pain and suffering caused by the failure to provide medical care; ULMER's prolonged mental anguish and emotional distress; medical expenses incurred; and such other damages as may be proven at trial.

### Count XII – State Law Wrongful Death
### (Institutional Negligence)
### Against COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES

282.    Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

283.    Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action on behalf of ULMER's next-of-kin pursuant to the Wrongful Death Act, 740 ILCS 180/1, *et seq*.

284.     Plaintiff attaches hereto an affidavit and medical report in compliance with 735

ILCS 5/2-622.

285.     At all relevant times, Defendant COOK COUNTY d/b/a CCHHS and CERMAK

HEALTH SERVICES had an independent duty and/or voluntarily and jointly assumed the non-

delegable duty of the COOK COUNTY SHERIFF to provide medical care to detainees of the Cook

County Jail, including:

>       (a)     A duty to manage and provide adequate on-site medical and mental health
> services for the detainees at the Jail.

>       (b)     A duty to provide sufficient staffing of qualified medical and mental
> health practitioners to effectively manage and operate CERMAK HEALTH SERVICES.

>       (c)     A duty to follow the medical policies and procedures set forth by COOK
> COUNTY; the COOK COUNTY SHERIFF; the standards set forth in the County Jail
> Act, 730 ILCS 125/0.01, *et seq.*; the Mental Health and Developmental Disabilities Code,
> 405 ILCS 5/1-100 *et seq.*; and the regulations set forth in 20 Ill. Admin. Code 701.90.

>       (d)     A duty to provide medical and support staff trained in accordance with
> NCCHC (National Commission on Correctional Healthcare).

286.     Defendant COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES

breached one or more of the aforesaid duties in one or more of the following manners:

>       (a)     Allowing a systems failure that resulted in the delay of ULMER receiving
> care or treatment, including life-saving treatment.

>       (b)     Allowing deficiencies which were known previously and thereafter led to
> harm to ULMER, including those with intake, screening process, inadequate health
> assessments, inadequate acute care, inadequate emergency services, inadequate
> medication administration, and inadequate record keeping.

>       (c)     Allowing the failure of staff and nurses to timely advise physicians of
> ULMER's worsening condition.

>       (d)     Failing to provide ULMER with medical care and services consistent with
> what a reasonably careful provider, acting through its agents, apparent and/or actual,
> should provide under similar circumstances

>       (e)     Failing to communicate or train its staff on the policy it adopted for
> restraints.

(f)     Failing to communicate or train its staff on the policy it adopted for emergency life-saving treatment.

(g)     Failing to enforce policies related to restriction notices upon administration of emergency medications.

(h)     Failing to enforce policies related to ensuring informed consent for treatment.

(i)     Failing to provide appropriate equipment, medication, or diagnostic testing for ULMER, such as those for his subarachnoid brain hemorrhage.

(j)     Failing to enforce rules and regulations for adequate patient care, including those in confinement or receiving mental health treatment.

(k)     Failing to hire sufficient numbers of employees to adequately and timely meet the medical needs of the population detained in the Jail.

(l)     Were otherwise careless, reckless, negligent, willful and wanton, or objectively unreasonable in the treatment of ULMER.

287.    As a direct and proximate result of COOK COUNTY d/b/a CERMAK HEALTH SERVICES' breach of its duty to protect ULMER from harm and to provide reasonable care and treatment to ULMER, he suffered significant physical and mental pain and distress and other damages, including death.

288.    The negligent and/or willful and wanton and/or objectively unreasonable acts and omissions by COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES were a substantial and significant contributing cause of ULMER's death, and it was reasonably foreseeable that COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES' acts or omissions would cause the harm or a similar harm that ULMER suffered.

289.    COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES knew ULMER faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it. As a direct and proximate result of the foregoing, ULMER was subjected to great physical and emotional pain and suffering, and ultimately death.

290.     Some or all of the foregoing injuries directly caused or contributed to ULMER's death on June 21, 2024.

291.     As a direct and proximate result of ULMER's death, ULMER's next-of-kin have suffered damages, including but not limited to loss of ULMER's companionship, guidance, advice, love, affection, and society; grief, sorrow, and mental anguish; funeral and burial expenses; and such other damages as may be proven at trial

### Count XIII – State Law Survival
### (Institutional Negligence)
### Against COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES

292.     Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

293.     Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

294.     Plaintiff attaches hereto an affidavit and medical report in compliance with 735 ILCS 5/2-622.

295.     At all relevant times, Defendant COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES had an independent duty and/or voluntarily and jointly assumed the non-delegable duty of the COOK COUNTY SHERIFF to provide medical care to detainees of the Cook County Jail, including:

(a)     A duty to manage and provide adequate on-site medical and mental health services for the detainees at the Jail.

(b)     A duty to provide sufficient staffing of qualified medical and mental health practitioners to effectively manage and operate CERMAK HEALTH SERVICES.

(c)     A duty to follow the medical policies and procedures set forth by COOK COUNTY; the COOK COUNTY SHERIFF; the standards set forth in the County Jail Act, 730 ILCS 125/0.01, *et seq.*; the Mental Health and Developmental Disabilities Code, 405 ILCS 5/1-100 *et seq.*; and the regulations set forth in 20 Ill. Admin. Code 701.90.

(d)     A duty to provide medical and support staff trained in accordance with NCCHC (National Commission on Correctional Healthcare).

296.    Defendant COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES breached one or more of the aforesaid duties in one or more of the following manners:

(a)     Allowing a systems failure that resulted in the delay of ULMER receiving care or treatment, including life-saving treatment.

(b)     Allowing deficiencies which were known previously and thereafter led to harm to ULMER, including those with intake, screening process, inadequate health assessments, inadequate acute care, inadequate emergency services, inadequate medication administration, and inadequate record keeping.

(c)     Allowing the failure of staff and nurses to timely advise physicians of ULMER's worsening condition.

(d)     Failing to provide ULMER with medical care and services consistent with what a reasonably careful provider, acting through its agents, apparent and/or actual, should provide under similar circumstances.

(e)     Failing to communicate or train its staff on the policy it adopted for restraints.

(f)     Failing to communicate or train its staff on the policy it adopted for emergency life-saving treatment.

(g)     Failing to enforce policies related to restriction notices upon administration of emergency medications.

(h)     Failing to enforce policies related to ensuring informed consent for treatment.

(i)     Failing to provide appropriate equipment, medication, or diagnostic testing for ULMER, such as those for his subarachnoid brain hemorrhage.

(j)     Failing to enforce rules and regulations for adequate patient care, including those in confinement or receiving mental health treatment.

(k)     Failing to hire sufficient numbers of employees to adequately and timely meet the medical needs of the population detained in the Jail.

(l)     Were otherwise careless, reckless, negligent, willful and wanton, or objectively unreasonable in the treatment of ULMER.

297.     The negligent and/or willful and wanton and/or objectively unreasonable acts and omissions by COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES were a substantial and significant contributing cause of ULMER's death, and it was reasonably foreseeable that the Defendant's acts or omissions would cause the harm or a similar harm that ULMER suffered.

298.     Defendant COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES knew ULMER faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it. As a direct and proximate result of the foregoing, ULMER was subjected to great physical and emotional pain and suffering, and ultimately death.

299.     Prior to his death, ULMER had a viable cause of action against COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES for institutional negligence, and had he survived, he would have been entitled to bring an action for the damages.

300.     As a direct and proximate result of the acts or omissions of COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES, ULMER suffered injures of a personal and pecuniary nature, including but not limited to ULMER's pain and suffering caused by the failure to provide medical care; ULMER's prolonged mental anguish and emotional distress; medical expenses incurred; and such other damages as may be proven at trial.

## Count XIV – *Monell* Policy Claim
### Against the COOK COUNTY SHERIFF, in his official capacity

301.     Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

302.     The actions of the individual SHERIFF'S OFFICER DEFENDANTS, as alleged above, were performed pursuant to one or more interrelated policies, practices, and/or customs of the Defendant COOK COUNTY SHERIFF.

303.    On July 11, 2008, the United States Department of Justice, pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, investigated patterns and practices at the Cook County Jail that violated the constitutional rights of inmates in adult detention and correctional facilities and issued a report of its findings (the "DOJ Report").

304.    The DOJ Report documented widespread policies, practices, and customs which demonstrated deliberate indifference to the adequacy or constitutionality of the health, safety, and medical care provided to detainees at the Jail.

305.    The DOJ Report documented deficiencies involving the Jail's initial intake screening process, inadequate health assessments, inadequate acute care, inadequate emergency care, inadequate medication administration, inadequate record keeping, and numerous other issues.

306.    The DOJ Report documented systemic deficiencies in mental health care at the Jail, including allowing Mental Health Specialists and technicians to perform the mental health initial intake screening at the Jail; inadequate assessment and treatment; and inadequate psychotropic medication administration, including delays for inmates receiving their prescribed psychotropic medications. The DOJ Report specifically notes that inmates who remain untreated may suffer from a worsening of their symptoms.

307.    The DOJ Report found that many of the Jail's shortcomings in mental health care, including delays in access to mental health care, were "exacerbated" by the Jail's lack of adequate staffing, support, training, and supervision.

308.    The DOJ Report found inmates at the Jail were:

"regularly subjected to inappropriate and excessive uses of physical force. CCJ officers too often respond to inmates' verbal insults or failure to follow instructions by physically striking inmates, most often with the active assistance of other officers, even when the inmate presents no threat to anyone's safety or the security of the facility. Moreover, even in cases in which the initial use of force is reasonable, officers sometimes continue to

engage in physical force after the inmate has been brought under control or is effectively restrained."

A top security administrator of the COOK COUNTY SHERIFF "frankly" acknowledged to the DOJ a "culture of abusing inmates."

309. The DOJ Report further stated the COOK COUNTY SHERIFF failed to elicit adequate information about use of force incidents. While most shift commanders reviewed Use of Force and Incident reports to ensure that they are completed, these reports were not reviewed for substantiative content. The COOK COUNTY SHERIFF did not undertake internal investigations promptly, and the DOJ found attempts by officers and other staff to conceal the inappropriate or excessive use of force.

310. As a solution, the DOJ stated that improved video cameras and overhead cameras "can augment inmate safety and security and provide essential information for investigators."

311. The DOJ Report found that many inmates were "locked in cells for as long as 26 hours with no access to drinking water." The DOJ Report also addressed the practice of extended lockdowns, which resulted in inmates spending continuous 26-hour periods locked inside their cells. Many of these cells had deficient maintenance such as plumbing failures, which resulted in "inhumane conditions" for these "unjustified, prolonged periods of in-cell confinement."

312. The DOJ Report reviewed the use of restraints and found that in over 50% of episodes, inmates were shackled with full leather restraints because of suicidal ideation and the fact that continuous observation was unavailable. The DOJ defined this as "grossly inappropriate."

313. Instead of continuous observation, the COOK COUNTY SHERIFF uses the practice of "cross-watching," or having one correctional officer simultaneously supervise two tiers of cells as opposed to one. By policy, the officer supervising a housing unit is supposed to conduct security rounds inside the unit every 30 minutes. When these rounds are conducted in one tier, the

second tier is unsupervised. The DOJ further noted that security check records are "spotty" and "suspiciously logged."

314.    After the DOJ Letter of Findings, the COOK COUNTY SHERIFF and COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES entered a consent decree ("Agreed Order") on May 13, 2010, in the matter of *United States v. Cook County, et al*., case number 10-cv-2946, in the United States District Court for the Northern District of Illinois, with terms and requirements "necessary to protect the constitutional rights of inmates" at the Jail.

315.    Pursuant to the Agreed Order, between September 20, 2010, and April 30, 2018, a monitoring team visited the Jail at six-month intervals and submitted sixteen separate reports documenting the progress of the COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES toward reaching substantial compliance with the Agreed Order.

316.    In January 2011, the COOK COUNTY SHERIFF and COOK COUNTY entered into an Inter-Agency Agreement in which they acknowledged their "mutual responsibility and interdependence in meeting the health care needs of detainees consistent with the safety and security of detainees and staff." The Agreement required the COOK COUNTY SHERIFF to participate with CERMAK HEALTH SERVICES in a coordinated approach to deliver healthcare and mental healthcare to detainees.

317.    The COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES did not reach substantial compliance with all provisions of the Agreed Order until the 14th monitoring report was submitted on May 2, 2017.

318.    After a federal judge ruled that the Jail's reforms met the terms of the Agreed Order, the Jail was allowed to operate without federal oversight for the first time in more than 40 years.

319.     Pursuant to this Agreed Order, the COOK COUNTY SHERIFF revised many of its written policies and procedures. However, many of the constitutional violations charged in the DOJ Report still affect detainees today due to practices so persistent and widespread at the Jail as to practically have the force of law.

320.     COOK COUNTY SHERIFF Policy 716, Portable Audio/Video Recorders, governs the use of body-worn cameras. The policy states that the use of body-worn cameras is specifically controlled by the Body Camera Act (50 ILCS 706), which provides that officer-worn body cameras are an important tool to settle allegations of officer misconduct, improve transparency and accountability, and strengthen public trust. Under Policy 716.2, the COOK COUNTY SHERIFF shall provide all sworn members access to portable recorders, which are intended to enhance the mission of the COOK COUNTY SHERIFF by accurately capturing contacts between sworn members and individuals in custody in the Jail.

321.     The Body Camera Act provides that all law enforcement agencies must implement the use of body cameras for all law enforcement officers. 50 ILCS 706/10-15(b). Cameras must be turned on at all times when the officer is in uniform and engaged in a law enforcement-related encounter that occurs while the officer is on duty. 50 ILCS 706/10-20(a)(3). However, a camera may be turned off when the officer is inside a correctional facility which is equipped with a functioning camera system.

322.     Pursuant to COOK COUNTY SHERIFF Policy 716.5, sworn members shall have the body-worn camera powered on at all times while they are duty in event mode (i.e. actively recording and retaining video and audio) to record, *inter alia*, use of force incidents, whether pre-planned or not; cell extractions; disturbances; refusals to lock up; fights; emergency calls; and "any

other contact that becomes adversarial after the initial contact in a situation that would not otherwise require recording."

323.    The COOK COUNTY SHERIFF does not provide most of the correctional officers at the Jail with body-worn cameras, in violation of its own policy and Illinois law. While the Body Camera Act allows cameras to be <u>turned off</u> when the officer is inside a correctional facility which is equipped with a functioning camera system, it does not create an exception under which the COOK COUNTY SHERIFF can fail to assign them to on-duty officers at all.

324.    The COOK COUNTY SHERIFF's written policies do not provide for this action based upon the discretion of the officer; instead, it should be at the request of medical staff. Under COOK COUNTY SHERIFF Policy 716.5,

> "Sworn members may have body-worn cameras in event mode in areas where medical procedures are being conducted so long as they are recording situations which otherwise would be recorded (e.g., interactions with individuals in custody). Sworn members should contact a on-duty supervisor if medical staff request that recording should cease; recording should continue unless otherwise instructed by that supervisor. If exigent circumstances prevent a sworn member from activating a body-worn camera when required, the camera shall be activated as soon as practicable (50 ILCS 706/10-20(a)(3)(A))."

325.    Similarly, COOK COUNTY HEALTH Policy # CC.024.01 states that body-worn cameras must "be turned off (deactivated)" in locations where a reasonable expectation of privacy exists "unless the patient's behavior creates a serious and imminent threat to the health and safety of a person, the clinical staff, and/or the public." This policy allows filming without patient authorization to document abuse or neglect, for safety or security, to monitor clinical condition via video surveillance, or for other legitimate purposes.

326.    COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES employees are aware that areas of CERMAK HEALTH SERVICES, including the urgent care/emergency room area and elevators, are not captured by surveillance cameras.

327. COOK COUNTY SHERIFF correctional officers, including SERGEANT REYES, use the Health Insurance Portability and Accountability Act (HIPAA) and "patient privacy" as an excuse to turn off their body-worn cameras within these areas of CERMAK HEALTH SERVICES. The COOK COUNTY SHERIFF has set forth in pleadings that this is done "pursuant to common practice and [Jail] policy interpreting HIPAA privacy laws." (*See* Defendants' Rule 56.1 Statement at ¶ 16, *Smith v. Cook County*, No. 14 C 1789 (N.D. Ill. Aug. 31, 2016)).

328. Law enforcement is not a "covered entity" which must comply with HIPAA under 45 CFR 160.103. HIPAA applies only to health plans, health care clearinghouses, and health care providers. COOK COUNTY SHERIFF officers have no obligation under HIPAA to turn off their body cameras or otherwise limit disclosure.

329. Because of (1) the widespread and accepted practice of failing to issue body-worn cameras to correctional officers at the Jail and (2) the widespread and accepted practice of allowing the few officers who do wear body-worn cameras to turn off the video upon entry to CERMAK HEALTH SERVICES, the officers and staff of the COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES commit constitutional deprivations, including excessive use of force inflicted as punishment, knowing their acts will not be captured on video.

330. CERMAK HEALTH SERVICES employees working within the emergency room area turn a blind eye to the uses of force by the COOK COUNTY SHERIFF officers or assist the misconduct by providing involuntary psychotropic medication to the victims, failing to document the medical care provided, and failing to report the use of force.

331. On March 22, 2012, detainee Matthew Smith was subjected to a use of force involving being struck in the face and pepper sprayed by Officer Trevizio. Later, Smith had a verbal dispute with Sergeant Thomas Conley outside of his cell. The decision was made to send

Smith as a "direct admit" to the PSCU of CERMAK HEALTH SERVICES. Per the COOK COUNTY SHERIFF's rules, a handheld video camera—the precursor to body-worn camera—recorded this cell extraction. However, the camera was turned off upon Smith's arrival to CERMAK HEALTH SERVICES. The elevator ride from the lower level of CERMAK HEALTH SERVICES to 2N usually takes a matter of seconds, but the parties did not arrive at their destination for 20 minutes. SMITH claimed in litigation that this was because the transport team took multiple elevator trips and punched and kicked him during the ride. Officers gave conflicting testimony and denied the beating, but Smith was found to have significant injuries. (*See Smith v. Cook County*, No. 14 C 1789 (N.D. Ill.)).

332.    On May 26, 2014, detainee Anthony Nuniz was beaten by Cook County Sheriff officer James Micetich while other officers, including a sergeant, watched. Micetich assaulted Nuniz in the same waiting area of the emergency room in the basement of CERMAK HEALTH SERVICES as ULMER ten years later. Nuniz later testified that Micetich had informed him "there were no security cameras at Cermak." The sergeant and officers involved attempted to cover up the incident. (*See Kolnicki v. Dart*, 2023 IL App (1st) 221089-U, ¶ 9).

333.    On February 21, 2024, detainee Quatwan Moore filed suit in the Northern District of Illinois against Defendant SERGEANT REYES. (*See Moore v. Reyes et. al*, No. 24 C 1507 (N.D. Ill. Jan. 6, 2025)). Moore claimed that SERGEANT REYES, along with other correctional officers, beat him while he was handcuffed to a bed in the CERMAK HEALTH SERVICES infirmary. Moore stated he was told by investigators that "there was no body cam footage to substantiate his claims, yet there were witnesses and hospital cameras." SERGEANT REYES, through the Cook County State's Attorney, "admit[ted] only that policies relating to body worn cameras speak for themselves and denie[d] any liability or wrongdoing."

334.    At least one witness to the use of force against ULMER has stated that they have witnessed SERGEANT REYES and OFFICER JACKSON beating another detainee under similar circumstances. This employee has stated they are afraid to come forward as a witness because they will suffer retaliation and harm.

335.    The COOK COUNTY SHERIFF is aware of the culture of violence at the Jail. The COOK COUNTY SHERIFF occasionally disciplines officers involved if sufficient evidence exists of the misconduct, but only if such evidence exists.

336.    However, the COOK COUNTY SHERIFF has deliberately stopped short of taking the step identified by the DOJ and Illinois law as the best response: ensuring the availability of video capturing use of force incidents.

337.    The Defendants who subjected ULMER to excessive force knew that, if they dragged him into CERMAK HEALTH SERVICES, they would be free to abuse him without consequence. SERGEANT REYES was able to claim that ULMER had knocked his body-worn camera off and that no other video existed because of the COOK COUNTY SHERIFF's common practices involving body-worn cameras.

338.    Because SERGEANT REYES' body-worn camera video is largely without audio, limited evidence exists regarding the conversation between SERGEANT REYES, OFFICER CODD, OFFICER MATANIC, OFFICER ALVAREZ, and ULMER which occurred before ULMER tried to leave his cell.

339.    The COOK COUNTY SHERIFF has a longstanding "code of silence" pervading the Jail in which COOK COUNTY SHERIFF officers will punish those who report misconduct. (*See e.g. Fairley v. Andrews*, 578 F.3d 518 (2009)).

340.    Approximately one week before ULMER's death, on June 12, 2024, nonprofit newsroom Injustice Watch published an article titled "Cook County Jail's deadliest year in decades reveals repeated lapses and failed oversight." After a review comprising thousands of pages of internal jail records, police investigations, and autopsy reports, Injustice Watch found a broad pattern of policy violations and lack of oversight.

341.    The records reviewed by Injustice Watch show that the COOK COUNTY SHERIFF does not timely or accurately report deaths to the Illinois Department of Corrections or perform internal reviews through its Office of Professional Review which lead to punishment or addressing the lapses.

342.    Injustice Watch asked the COOK COUNTY SHERIFF for records related to cross-watching and were informed by a spokesperson that the COOK COUNTY SHERIFF did not keep those records.

343.    ULMER's death, likewise, was not timely or accurately reported to the Illinois Department of Corrections. Despite the Cook County Medical Examiner's autopsy concluding his death was a homicide on October 23, 2024, the Illinois Death in Custody 2024 Annual Report published in February 2025 pursuant to the Illinois Reporting of Deaths in Custody Act shows zero in-custody homicides reported. The database maintained by this state authority shows that the "manner of death" field for ULMER's case is blank, and the homicide is only listed in the notes.

344.    These failures are also listed in the 2024 annual County Jail Inspection Report conducted by the Illinois Department of Corrections, which lists the COOK COUNTY SHERIFF's non-compliance with Illinois County Jail Standards 701.30 Records. This report states extraordinary and unusual circumstances are not properly reported by the COOK COUNTY SHERIFF, as required by law:

66

"Per County Jail Standards Section 701.30 Records Subsection C. Extraordinary or Unusual Occurrences Parts 2F and 2G where part 2F requires "A summary of the facts and circumstances surrounding the occurrence" and where part 2G requires "…recommendations to prevent subsequent occurrences." Reports submitted by CCJ are typically limited to a single sentence and fail to effectively summarize the events or recommendations to prevent subsequent occurrences."

345.    On December 19, 2024, the COOK COUNTY Board of Commissioners held a hearing in response to the Injustice Watch investigation. COOK COUNTY SHERIFF Tom Dart's attendance was requested by the COOK COUNTY Board. Dart chose not to attend the hearing. General counsel for the COOK COUNTY SHERIFF refused to tell the COOK COUNTY Board of Commissioners how often cross-watching was used at the Jail and blamed officer absences due to their union contract with COOK COUNTY.

346.    Pursuant to CCDOC Policy 708, Use of Restraints, custody restraints, including steel handcuffs, leg restraints, and restraint chairs,

"shall be used only to prevent self-injury, injury to others or property damage. Restraints may also be applied according to classification, such as maximum security, to control the behavior of a high-risk individual in custody while they are being moved outside the cell or housing unit. Restraints shall never be used for retaliation or as punishment. Restraints shall not be utilized any longer than is reasonably necessary to control the individual in custody. Restraints are to be applied only when less restrictive methods of controlling the dangerous behavior of an individual in custody have failed or appear likely to fail."

347.    The COOK COUNTY SHERIFF's overuse of restraints and failure to report these uses is widespread and pervasive. The COOK COUNTY SHERIFF has, in recent years, vigorously defended its custom of shackling the seriously ill (*see Cullom v. Dart*, No. 20 C 4034 (N.D. Ill. Dec. 27, 2020); *see also Gama v. Dart*, No. 20 C 3449 (N.D. Ill. Nov. 19, 2020); *see also Wilson v. Dart*, 20 C 7009 & 20 C 7119 (N.D. Ill. June 22, 2021); *see also Fulson v. Dart*, 648 F. Supp. 3d 1022 (2023)) and pregnant women in labor (*see Zaborowski v. Sheriff of Cook County*, No. 08 C 06946 (N.D. Ill. Jan. 26, 2011)).

348.     An investigation published by the Illinois Answers Project on April 22, 2025, found that Cook County Jail used restraint chairs 874 times between 2019 and 2023. The COOK COUNTY SHERIFF refused to provide incident reports and logs but instead provided a list of incidents showing the date and time, location, and a brief description of the reason for use. Illinois Answers claimed that it spent months trying to obtain the "extraordinary or unusual occurrences" reports required by statute for such incidents and that none could be found.

349.     The COOK COUNTY SHERIFF adhered to this common and unconstitutional practice by handcuffing and shackling ULMER for many hours without good cause, causing suffering in his last few hours of life and worsening of his mental health condition.

350.     The COOK COUNTY SHERIFF has deliberately allowed the widespread and unconstitutional practices of insufficient body-worn camera use, insufficient reporting, and overbroad and punitive restraint chair use to continue for decades. The higher-ranking officials within the COOK COUNTY SHERIFF are aware of this custom and have defended its existence.

351.     The COOK COUNTY SHERIFF has failed to properly train its officers on the proper use of body-worn cameras, reporting the use of force, or the proper use of restraints pursuant to its own policies and the requirements of state and federal law.

352.     Said interrelated policies, practices, and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference and encouraged the abusive tactics and techniques, the suppression and destruction of evidence, the making of false statements and reports, and were, separately and together, the moving force behind, and a direct and proximate cause of, the unconstitutional acts by the named Defendants and the suffering, injuries, and death of ULMER.

353.     In addition to compensatory damages, Plaintiff will also seek to recover, under 42 U.S.C. § 1988, attorney's fees and costs incurred during the course of this litigation.

**Count XV – State Law Survival**
**(Conspiracy)**
**Against COOK COUNTY SHERIFF, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, SERGEANT REYES, OFFICER CODD, OFFICER ALVAREZ, LIEUTENANT KELLY, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS**

354.     Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

355.     Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

356.     Defendants OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA, together with their named and unsued co-conspirators, reached an understanding and engaged in a course of conduct to cover up the use of force and misconduct against ULMER which caused him to suffer a head injury.

357.     In furtherance of this conspiracy or conspiracies, the Defendants OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA, together with their named and unsued co-conspirators, committed overt acts in furtherance of their conspiracy which included failing to report or document ULMER's injuries, failing to submit a written report, turning a blind eye, and failing to report the other officers' misconduct despite a duty to do so.

358.     Defendants SERGEANT REYES, OFFICER CODD, OFFICER ALVAREZ, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS, with the named and other unsued co-conspirators, including police and prosecutorial investigative, medical, supervisory, executive, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted

and/or conspired among and between themselves to cover up the use of force and misconduct against ULMER that occurred at the direction of SERGEANT REYES.

359.   In furtherance of this conspiracy or conspiracies, SERGEANT REYES, OFFICER CODD, OFFICER ALVAREZ, LIEUTENANT KELLY, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS, together with their named and unsued co-conspirators, took overt acts in furtherance of the conspiracy that included one or more of the following:

(a)   Preparing false reports,

(b)   Failing to document and misrepresenting ULMER's injuries,

(c)   Threatening witnesses,

(d)   Instructing medical providers not to document ULMER's injuries,

(e)   Spoliation of evidence,

(f)   Reviewing body-worn camera videos of an in-custody death in violation of Law Enforcement Officer-Worn Body Camera Act (50 ILCS 706/10-20(a)(6)),

(g)   Failing to provide body-worn camera video to investigators,

(h)   Failing to promptly report the in-custody death to the Cook County Medical Examiner,

(i)   Refusing to allow ULMER's body to be transported to the Mount Sinai Hospital morgue,

(j)   Interfering with or obstructing the Illinois State Police in-custody death investigation,

(k)   Interfering with or obstructing the Cook County Medical Examiner's investigation,

(l)   Failing to report ULMER's death as a homicide pursuant to the Illinois Reporting of Death in Custody Act (730 ILCS 210 *et seq*.) and/or the federal Death in Custody Reporting Act (H.R. 1447),

(m)   Refusing to provide records under lawful Freedom of Information Act requests,

(n)     Turning a blind eye to misconduct,

(o)     Failing to report the misconduct described above despite a duty to do so, and

(p)     Allowing a homicide to occur on their premises without taking disciplinary measures against those responsible.

360.    Said conspiracies and overt acts were and are continuing in nature.

361.    The acts of these Defendants are directly chargeable to the COOK COUNTY SHERIFF under state law pursuant to *respondeat superior.*

362.    As described above, the COOK COUNTY SHERIFF has a pattern and practice of covering up or turning a blind eye to the use of excessive force by its officers.

363.    The acts of these Defendants fall outside of routine police practice and were committed in order to cover up misconduct, protect their follow officers from disciplinary action and prosecution, avoid civil liability, and/or otherwise obstruct justice.

364.    In addition to compensatory damages, Plaintiff will also seek to recover attorney's fees and costs incurred during the course of this litigation.

365.    The actions of these Defendants were reprehensible, willful and wanton and malicious, thereby justifying an award of punitive damages.

### Count XVI – Indemnification Claim
### Against COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES

366.    Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

367.    Pursuant to 745 ILCS 10/9-102, 55 ILCS 5/5-1106, and 55 ILCS 5/3-6016, COOK COUNTY is empowered and directed to pay any judgment for compensatory damages and any associated attorney's fees and costs for which COOK COUNTY, the COOK COUNTY SHERIFF, and/or their agents or employees, acting within the scope of their employment, are found liable.

368. The acts and/or omissions of all individual SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS were committed within the scope of their employment and under the color of law.

369. If a judgment for compensatory damages and attorneys' fees and costs is entered against the COOK COUNTY SHERIFF, any individual SHERIFF'S OFFICER DEFENDANT, or any individual and CERMAK HEALTH DEFENDANT, then COOK COUNTY must pay the judgment as well as the associated attorney's fees and costs.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff, ROBERT ROBINSON, as Independent Administrator of the ESTATE OF CORY ULMER, deceased, respectfully requests that this Court:

A. Enter judgment against the COOK COUNTY SHERIFF, in his official capacity; COOK COUNTY d/b/a COOK COUNTY HEALTH AND HOSPITAL SYSTEMS and CERMAK HEALTH SERVICES, and each of the individual Defendants;

B. Award Plaintiff compensatory damages, including damages for pain, suffering, emotional distress, loss of society, grief and sorry, medical bills, funeral and burial expenses, and all other damages allowed under state and federal law, in a sum to be ascertained at trial;

C. Award Plaintiff punitive damages against the individual defendants in a sum to be ascertained at trial;

D. Award Plaintiff attorney's fees and costs pursuant to 42 U.S.C. § 1988 or any other applicable law for all federal claims alleged herein;

E. Order COOK COUNTY and the COOK COUNTY SHERIFF to indemnify their individual employee Defendants for any judgment entered in this case arising from the actions of said Defendants; and

F. Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury in this action of all issues so triable.


Dated: June 16, 2025                    Respectfully submitted,

                                        /s/    Jesse B. Guth
                                        Guth Law Office, LLC
                                        21 S. Evergreen Ave, Suite 200-112
                                        Arlington Heights, IL 60005
                                        (773) 820-8218
                                        jesse@guthlawoffice.com
                                        Counsel for Plaintiff

                                        **JURY TRIAL DEMANDED**