**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT ROBINSON, as Independent Administrator of the Estate of CORY ULMER, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 25-cv-06643 |
| | ) | |
| COOK COUNTY SHERIFF, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

The Defendants move under Fed. R. Civ. Pr. 12(b)(6) to dismiss Plaintiff's *Monell* claim against the Cook County Sheriff, in his official capacity, (Dkt. 1, Count XIV, incorporating ¶¶ 1-127), as well as Plaintiff's Fourteenth Amendment claim for delayed/denied medical care against Sergeant Reyes and Officers Davis, Sprayberry, Garcia, Alvarez, Codd, Matanic, Jackson, Lesnicki, O'Hearn, Novak, Preto, Romo, and Kavanaugh (the "Correctional Officer Defendants") (Dkt. 1, Count III). *See* Dkt. 47. For the reasons stated below, Plaintiff respectfully requests that this Honorable Court deny the Defendants' motion in its entirety or, in the alternative, grant him leave to amend his Complaint to supplement or clarify his allegations.

**BACKGROUND**

On June 20, 2024, Cook County Sheriff officers arrested Ulmer near Midway Airport for an alleged violation of his electronic monitoring curfew. Dkt. 1 at ¶ 39. Arresting officers discussed bringing Ulmer home but instead took him to the Cook County Jail for a "med restart." *Id.* ¶ 40. During intake, Ulmer's medication history and previous diagnoses of type 2 diabetes and bipolar disorder were confirmed. *Id.* ¶¶ 44-45. Ulmer was classified as a "P4," a patient with the highest mental health needs. *Id.* ¶ 51. Over the next 36 hours, officers kept Ulmer in a small holding cell near the emergency room area of Cermak Health Services. *Id.* ¶ 56. Ulmer did not receive the

psychotropic medication he required. *Id.* ¶¶ 2, 46. Instead, the Correctional Officer Defendants responded to Ulmer's "erratic" behavior by using restraints and excessive force. *Id.* ¶¶ 61-70.

On June 21, 2024, Correctional Officer Defendants caused Ulmer significant injuries in two separate incidents. In the morning, Officers Davis, Sprayberry, and Garcia caused Ulmer to fall to the ground and strike his head on a metal pole while returning him to his cell. *Id.* ¶ 74. These Defendants failed to report their use of force or seek medical care for Ulmer. *Id.* ¶ 77. *Id.* An autopsy later found a subarachnoid hemorrhage on Ulmer's brain, which was a life-threatening injury. *Id.* ¶ 76. (Defendants' Rule 12(b)(6) motion omits any mention of this incident.)

The second use of force occurred about eight hours later. Defendant Sgt. Reyes, along with Officers Alvarez, Codd, and Matanic, entered Ulmer's cell to retrieve a shackle left behind after the morning incident. *Id.* ¶ 86. At the time, Reyes wore a body cam. *Id.* ¶ 88. As the officers left the cell, Ulmer attempted to exit behind them. *Id.* ¶ 89. The officers tackled Ulmer to the ground, and others responded to assist. *Id.* ¶ 90. Reyes unmuted his body-worn camera and ordered the officers to "drag" Ulmer to the nearby Cermak E.R. area approximately 20 feet away. *Id.* ¶¶ 90-92. Upon arrival, Reyes allegedly deactivated his body-worn camera as Ulmer lay motionless on the floor. *Id.* ¶¶ 94-95. Officers then took Ulmer out of sight of the single camera at the entrance to the Cermak E.R. *Id.* ¶ 97. Ulmer yelled that he needed a doctor. *Id.* ¶ 98. Once out of view of the overhead security camera, several officers beat Ulmer, hitting and kicking him in the head, abdomen, knee, and leg. *Id.* ¶ 99. The remaining Correctional Officer Defendants arrived on scene, and Sgt. Reyes told a nurse that he believed Ulmer needed emergency medication. *Id.* ¶¶ 100-03. An intramuscular sedative was injected into Ulmer's buttocks, and officers placed Ulmer into a restraint chair. *Id.* ¶ 104-05. During this time, Ulmer went limp "like a ragdoll" and started foaming at the mouth, and about ten minutes after the injection was ordered, Cermak's Ward Clerk called

9-1-1 and paged medical staff. *Id.* ¶¶ 106-07. Paramedics transported Ulmer to Mount Sinai Hospital, and he was pronounced deceased several minutes after his arrival. *Id.* ¶¶ 109, 113.

The Cook County Medical Examiner ruled Ulmer's death a homicide. *Id.* ¶ 124. The Medical Examiner's autopsy noted injuries to Ulmer's wrists and ankles from his restraints, a blunt-force injury to Ulmer's head resulting in a blain bleed, and other lacerations, contusions, and hemorrhages all over Ulmer's body from the beating he had received. *Id.* ¶¶ 126-27.

## LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint, not its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a motion to dismiss under Rule 12(b)(6), a complaint needs only to contain enough facts, accepted as true, "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not mean probability: a court reviewing a 12(b)(6) motion must "ask itself could these things have happened, not did they happen." *Huri v. Office of the Chief Judge of the Circuit Court of Cook County*, 804 F.3d 826, 833 (7th Cir. 2015) (citing *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I. Plaintiff has adequately pleaded at this stage that the Cook County Sheriff's unconstitutional policies caused his decedent's injuries (Count XIV).

Ulmer's death was not a "random event" but, rather, was the consequence of longstanding practices at the Jail. This Court should not be persuaded by Defendants' attempts to convince it to "bury its head in the sand to the fact that other incidents and/or complaints" exist involving similar misconduct. *Klingler v. City of Chicago*, 2017 WL 3394722, at *4 (N.D. Ill. Aug. 8, 2017).

*Monell* recognized that, when execution of a government's policy or custom is the moving force behind a constitutional violation, then that government entity is responsible under § 1983. *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 694 (1978). For *Monell* liability, a plaintiff must prove: (1) a municipal action, which can be an express policy, a widespread custom, or an act by an individual with policy-making authority; (2) culpability, meaning, at minimum, deliberate conduct; and (3) that the action was the "moving force" behind the constitutional injury. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598 (7th Cir. 2019).

At issue are two widespread and longstanding practices at the Cook County Jail—namely, that correctional officers (1) use excessive force on detainees in areas without video surveillance, and (2) restrain detainees for prolonged periods without penological justification. These actions are performed in violation of the Sheriff's express written policies, and Plaintiff does not allege that the written policies themselves are unconstitutional on their face or caused Ulmer's injuries. Dkt. 1 at ¶¶ 320-25. The Sheriff's motion claims that "Plaintiff has seemingly conflated at least five separate theories into one" and then attacks these strawman theories. Dkt. 47 at 5. But this fails to address Plaintiff's core contention: the Sheriff has had notice for years that these constitutional violations are occurring but has failed to stop them. *See* Dkt. 1 at ¶¶ 303-319.

A municipal entity can be liable for constitutional injuries without reference to a series of bad acts if it can be shown that the injury is a "highly predictable consequence" of a municipal custom or practice. *See Bd. of Cty. Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997). Further, Plaintiff alleges that Sheriff employees, including those in supervisory roles, conspired and took active steps to "cover up" the circumstances surrounding Ulmer's death. *Id.* ¶¶ 101-02, 114-23, 354-65. As a result, the Sheriff "is complicit with the officers," and the "drawing of an inference from a series of bad acts by subordinate officers is not required." *Jackson v. Marion*

*Cnty*., 66 F.3d 151, 153 (7th Cir. 1995). On this basis alone, Plaintiff's allegations are "adequate" to state a claim against the governmental entity that caused Ulmer's constitutional injuries. *Id.*

The Sheriff's inaction in addressing years-long patterns of violations is implicated as well. An ultimate finding requires a plaintiff to demonstrate an entity had notice that gaps in its policies will cause constitutional violations and requires a "known or obvious" risk that constitutional violations will occur. *J.K.J. v. Polk Cnty*., 960 F.3d 367, 379 (7th Cir. 2020). If correctional officers at the Jail have a practice of using excessive force on detainees in areas where they know is no surveillance, it logically follows that they do so because they are confident that their abuse will not be reported by their fellow officers. The same holds true with the punitive use of restraints.

While these violations were almost certainly caused at least in part by the "code of silence" and officers' turning a blind eye to misconduct, there is also a possibility that they were caused in part by the Sheriff's failure to train certain employees "about their legal duty to avoid violating citizens' rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). This is supported by, for example, Reyes' telling ISP investigators he had turned off his camera because it was "normal protocol" for "privacy reasons," an assertion the Sheriff's employees have made in other cases despite contradiction by the Sheriff's actual policies and Illinois law. *Id.* ¶¶ 95, 339, 350-51. Whether the constitutional violations alleged are part of a deliberate cover-up of misconduct due to a "code of silence" or are simply caused by the Sheriff's failure to train its employees on its written policy and law, or some combination of both, is a decision for the jury. *See Obrycka v. City of Chicago,* 913 F. Supp. 2d 598, 604 (N.D. Ill. 2012) (code of silence or widespread custom or practice of failing to investigate and/or discipline CPD officers, or both, support jury verdict for plaintiff without specification as to which policy was the basis.) The Complaint should be "read as referring to a set of interrelated, mutually-reinforcing customs or practices, all of which contribute to civil

rights violations of the kind alleged" by Plaintiff. *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 893 (N.D. Ill. 2016). Any ambiguity in the Complaint regarding the custom or practice that allegedly caused Ulmer's injury "affords no basis for dismissal of [the] *Monell* claim." *Id*.

Defendants rely upon various summary judgment decisions in support of their Rule 12(b)(6) argument that Plaintiff has not adequately supported his *Monell* claim. But "summary judgment decisions are of little utility in resolving a Rule 12(b)(6) motion, especially when they relate to a factual question that must be addressed at a later stage." *Dubose v. Hallinan*, 2021 WL 492873, at *3 (N.D. Ill. Feb. 10, 2021). At the pleading stage, Plaintiff need not "identify every other or even one other individual" subjected to similar constitutional violations at the Jail. *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (federal courts may not apply a "heightened pleading standard" to *Monell* claims); *see also Barwicks v. Dart*, 2016 WL 3418570, at *4 (N.D. Ill. June 22, 2016) (at the motion to dismiss stage, a plaintiff "need only allege a pattern or practice, not put forth the full panoply of evidence").

**A. The Sheriff improperly relies on materials outside the pleadings.**

The Sheriff attaches five exhibits showing that some of the cases cited by Plaintiff in support of his claims were dismissed after settlement. *See* Dkt. 47, Ex. A-E. As a "general rule," on a Rule 12(b)(6) motion, the court may consider only the complaint. *Rosenblum v. Travelbyus.com Ltd*., 299 F.3d 657, 661 (7th Cir. 2002). A narrow exception exists if documents are referred to in the complaint and are *central* to a claim, but this exception is "aimed at cases interpreting, for example, a contract. It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). This exception would perhaps apply if Plaintiff's *Monell* theory relied on the existence of settlement payments made by the Sheriff as being

probative of liability. But Plaintiff instead cites to the Sheriff's representations within those cases' pleadings, testimony, briefs, and exhibits, all of which may be properly considered as admissible evidence. *Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of U.S., Inc*., 547 F. Supp. 2d 879, 898 (N.D. Ill. 2008); *see also United States v. McGee*, 189 F.3d 626, 632 (7th Cir. 1999) (a party's own statement offered against the party is not hearsay, per Fed. R. Evid. 801(d)(2)(A)). Plaintiff has alleged that "specific CCSO policies and practices are responsible for creating an environment" in which detainees are subjected to excessive force and restraint use. *Adams v. Cook Cnty. Sheriff's Off.*, 2024 WL 263035, at *8 (N.D. Ill. Jan. 24, 2024). These facts are sufficient to "present a story that holds together" that the Sheriff has continuously failed to address unconstitutional practices despite receiving notice of them through litigation. *Id.*

Further, the Sheriff has not actually requested that this Court take judicial notice of these documents. Even if he had, the Sheriff cannot, through collateral estoppel, preclude Plaintiff from litigating his own *Monell* claims through requesting judicial notice of a court's earlier stipulated dismissals, as this would be "an earlier determination in a case in which the plaintiff was neither a party nor in privity with a party." *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1081-83 (7th Cir. 1997) (citations omitted). "Due process prohibits the use of collateral estoppel in these instances because the plaintiff has never been afforded the opportunity to present its evidence and arguments on the claim." *Id.* Consent judgments support claim preclusion but not issue preclusion. *Arizona v. California*, 530 U.S. 392, 414 (2000).

Defendants' arguments have required Plaintiff to submit various exhibits in opposition to the Rule 12(b)(6) motion, but Plaintiff has done so "for illustrative purposes" only and asks that the Court not use these materials for conversion into a Rule 56 motion for summary judgment.

*Geinosky v. City of Chicago*, 675 F.3d 743, 745 (7th Cir. 2012). Defendant's motion should be denied so that Plaintiff may gather evidence through formal discovery on all counts.

**B. Plaintiff plausibly alleges that the Sheriff's video and surveillance practices lead to the violation of detainees' constitutional rights.**

As the Sheriff apparently recognizes, he does indeed "get sued a lot" for correctional officer misconduct within the Cook County Jail. *See* Dkt. 47 at 7, quoting *Black v. City of Chi.*, 2022 WL 425586, at *6 (N.D. Ill. Feb. 11, 2022). But Plaintiff's *Monell* claim is not built on the general premise that there are many lawsuits involving beatings within the Jail. *See Black*, 2022 WL 425586, at *4 (summary judgment granted due to plaintiff's general allegations of "widespread practices.") Plaintiffs' Complaint references three incidents involving beatings in the *basement of Cermak* in which correctional officers used the lack of video as a shield. *See* Dkt. 1 at ¶¶ 327, 331-34. In each case, the Sheriff directly placed its own policy regarding video creation, retention, or availability within Cermak at issue. *Id.* Just hours after Ulmer's death, this policy was referenced by Defendant Sgt. Reyes, the Cermak building supervisor, during his ISP interview. *Id.* ¶ 95.

Plaintiff's Complaint in the first case, *Smith v. Cook County*, No. 14-cv-1789, points not to the settlement as relevant but instead to the Rule 56.1 Statement filed by the Sheriff. *See* Dkt. 47 at 8-9; Dkt. 1 at ¶ 327. In his Statement, the Sheriff avers that the defendant officer turned off his camera upon arrival at Cermak, "[p]ursuant to common practice and CCJ policy interpreting HIPAA privacy laws;" the plaintiff disagreed, as Plaintiff does here. (See Plaintiff Response to the Sheriff's Rule 56.1 Statement in 14-CV-01789, attached as Ex. 1, at ¶ 16). In a *Monell* claim, the Sheriff's policies are at issue. The *Smith* correctional officer involved in the use of force incident provided the same explanation for the lack of video as Defendant Reyes years later. Dkt. 1 at ¶ 95.

The Sheriff's argument that the *Kolnicki* case is distinguishable is also incorrect. Dkt. 47 at 9-10; Dkt. 1 at ¶ 332. In *Kolnicki*, a detainee was hogtied and beaten in the same Cermak area

as Ulmer. In both incidents, the lack of cameras in Cermak enabled the abuse and the subsequent cover-up. Officer James Micetich was federally prosecuted for his use of excessive force and pled guilty to lying to the FBI after officers failed to report the incident or preserve video evidence. (*See* Indictment and Plea of Guilty, *USA v. Micetich*, 15-CR-397, attached as Ex. 2). During the years of state and federal litigation that followed, the Sheriff replaced the handheld video recorders with body-worn cameras. Yet the Sheriff took no meaningful steps to address the circumstances which caused this litigation: officers denying their involvement in the beating, confident that they could do so because there were no security cameras in Cermak. In the instant motion, the Sheriff argues that *Kolnicki* was not about body-worn cameras. Dkt. 47 at 9. But given the Sheriff's supposed "policy" that detainees should not be recorded within Cermak, as detailed in *Smith*, the Sheriff would have had no reason to raise that point in *Kolnicki* Merit Board hearings. Plaintiff has reviewed thousands of pages of records from both *Smith* and *Kolnicki* and requests leave to amend his Complaint to expand upon the relevance of these cases if the Court requires further information.

The third case, *Moore v. Reyes et. al*, is pending before this Court and involves allegations that Sgt. Reyes and other officers beat another inmate within Cermak just months before Ulmer's death. Dkt 1 at ¶ 333. (*See* Reyes' Answer and Affirmative Defenses in No. 24-C-1507, attached as Ex. 3). Moore alleges that, after the beating, he was informed there was a "lack of body cam footage to substantiate his claims." *Id.* ¶ 19. Reyes filed an answer and "admit[ted] only that policies relating to body worn cameras speak for themselves." *Id.* Moore also claims that, before the incident, his requests to use the restroom were denied and that he "was told to (expletive) on himself." *Id.* ¶ 10; *see* Dkt. 1 at ¶ 60. The factual overlap with the present case, combined with the Sheriff's again placing his body-worn camera policies at issue, more than suffices to show that this is a longstanding and widespread practice by the Sheriff's correctional officers.

The case relied upon by the Sheriff in support of his argument about the DOJ report, *Taylor v. City of Chi.,* 2021 WL 4523203, at *3 (N.D. Ill. Oct. 4, 2021), was recently distinguished by this Court in *Cosby v. Rodriguez*, 711 F. Supp. 3d 983 (N.D. Ill. 2024). Dkt. 47 at 10-11. In *Cosby*, the plaintiff's *Monell* claim alleged widespread use of excessive force by CPD against protestors, supported by several prior incidents at protests in 2003, 2011, and 2016. *Cosby*, 711 F. Supp. 3d at 1010. The *Cosby* plaintiff also referenced a DOJ report and multiple news and investigative reports, including a *Chicago Reader* report "which documented more than eighty instances" of protestor beatings. *Id.* at 1010-11. The City, like the Sheriff here, cited to *Taylor*, but the Court rejected this argument, pointing out the *Taylor* plaintiff had not cited to the DOJ reports in his complaint or tie the practices outlined to his specific injuries, nor did he provide "multiple news and investigative reports" that unlawful CPD customs "continued to be widespread," as the *Cosby* plaintiff had. *Id.* at 1012, citing *Taylor*, 2021 WL 4523203, at *3. Here, too, Plaintiff has referenced the DOJ report to show that the Sheriff has long had notice of these problematic policies but has not "responded reasonably to them," not to prove the truth of the matter asserted regarding problems that still exist today. *Daniel v. Cook Cnty*., 833 F.3d 728, 737 (7th Cir. 2016). *Cosby* also undermines any argument by the Sheriff that Plaintiff's cases are too remote or that investigative reports by journalists do not warrant consideration.

If this Court requires Plaintiff to raise additional allegations entailing the widespread practice of officer beatings at the Cook County Jail occurring in areas with no cameras, then Plaintiff respectfully requests leave to amend his complaint to include, *inter alia*, the cases recently cited by this Court in *Gonzalez v. Rodriguez*, 2025 WL 1384289, at *5 (N.D. Ill. May 13, 2025) (denying the Sheriff's Rule 12(b)(6) motion on a *Monell* claim for beatings in elevators without cameras), as well as *Tyson v. Cook Cnty*., 539 F. Supp. 3d 924, 928 (N.D. Ill. 2021), another case

where a detainee in shackles alleges he was beaten in the waiting room area of Cermak and that video evidence that should exist was spoliated.

**C. The Sheriff maintains a widespread custom of overusing restraints.**

The Due Process Clause of the Fourteenth Amendment prohibits the use of bodily restraints in a manner that punishes a pretrial detainee. *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000). The use of bodily restraints constitutes punishment in the constitutional sense if their use is not rationally related to a legitimate non-punitive government purpose or they appear excessive in relation to the purpose they allegedly serve. *Bell v. Wolfish*, 441 U.S. 520, 561 (1979).

In recent years, the Sheriff has faced significant litigation and criticism about his overuse of restraints on vulnerable detainees. Dkt. 1 at ¶ 347-49. The Sheriff's counsel attempts to distinguish the numerous unsuccessful 12(b)(6) motions she has filed on this topic "as counsel of record" over the last five years in cases cited by Plaintiff. Dkt. 47 at 12. As in those other motions, counsel improperly sets forth various "counter-facts" in support of dismissal. *See Wilson v. Dart*, 2021 WL 2549401, at *3 (N.D. Ill. June 22, 2021). In those other cases, the Sheriff did not deny that the detainees were shackled for extended periods, but rather attempted to justify his practices and denied that his policy caused critically ill plaintiffs any "cognizable harm." *Cullom v. Dart*, 2020 WL 7698366, at *1 (N.D. Ill. Dec. 27, 2020).

The Sheriff mentions the Illinois Answers Project report cited by Plaintiff in his Complaint without directly addressing it.[1] Dkt. 1 at ¶ 348. On April 22, 2025, Illinois Answers reported that almost 900 incidents involving restraint chair use in Cook County were never reported to the Jail and Detention Standards Unit (JDSU) of the IDOC, as is required by 20 Ill. Admin. Code, §

[1] *See* https://illinoisanswers.org/2025/04/22/restraint-chairs-unreported-cook-county-jail/. This Court may consider this recent article, referenced by Plaintiff in his Complaint and submitted here in opposition of the Defendant's Rule 12(b)(6) motion; *see Geinosky*, 675 F.3d 743.

701.30(c)(3). When Illinois Answers asked the Sheriff's Office about its failure to report restraint use, the Sheriff stated that "the standard for reporting restraint chair[s] was initially unclear" and that it began reporting after it received Illinois Answers' inquiry. The IDOC also listed this failure to report restraint use on its 2024 Compliance Monitoring report. Dkt. 1 at ¶ 344. (See Ex. 4).

Taken together, Plaintiff has more than pleaded facts sufficient to raise a right to relief above the speculative level and provide "fair notice" of his *Monell* claims to the Sheriff. *Twombly*, 550 U.S. at 555. The Sheriff's failures to report incidents involving these practices, as required by Illinois law, should weigh against dismissing this claim at the pleading stage, as this limited the publicly available information to support a *Monell* claim. Evidence about specific incidents, such as grievance reports, would be in the custody of the Sheriff (and his undersigned counsel, who has represented him in many cases involving restraint use). If this Court agrees with the Sheriff's contention that Plaintiff has failed to state a *Monell* claim, then Plaintiff requests leave to amend his Complaint to clarify his allegations as needed. Otherwise, Plaintiff asks that this Court deny Defendants' motion and allow Plaintiff to conduct discovery on his claims.

## II. The Correctional Officer Defendants acted objectively unreasonably in failing to ensure Ulmer received medical care.

The Correctional Officer Defendants also argue that Plaintiff "failed to state an actionable claim" against them for delayed or denied medical treatment. Dkt. 47 at 15. In support of this argument, the Defendants cite to various cases from 1996 through 2010 involving prison officials' failure to provide medical care. *See Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006); *Greeno v. Daley*, 414 F.3d 645, 655-56 (7th Cir. 2005); *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Defendants' failure to provide any more recent authority in support of their motion is telling.

Defendants attempt to apply an incorrect standard to the case at bar. This is not an Eighth Amendment case litigating cruel and unusual punishment. Ulmer, a pretrial detainee, was entitled to the due process protections of the Fourteenth Amendment. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015) ("The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'") While the Supreme Court's holding in *Kingsley* addressed the use of force in jails, the Seventh Circuit expanded this distinction to include medical-care claims in *Miranda v. Cnty. of Lake*, 900 F.3d 335 (7th Cir. 2018). *Miranda* made clear that a pretrial detainee did not need to prove that the defendant was "subjectively aware" that his conduct was unreasonable, but instead, that the "defendant's conduct was *objectively* unreasonable." *Id.* at 351, citing *Kingsley*, 135 S.Ct. 2472-73 (emphasis in original). The "proper inquiry turns on whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care." *Pittman by & through Hamilton v. Madison Cnty., Illinois*, 108 F.4th 561, 570 (7th Cir. 2024).

There are two rules by which to evaluate the liability of correctional officers for breaching their duty to act in an objectively reasonable manner to ensure a pretrial detainee's access to medical care. *Smith v. Whitsel*, 134 F.4th 962, 965-66 (7th Cir. 2025). First, there is a general rule that correctional officers may not ignore plaintiffs in obvious distress. *Id.* at 966, citing *Berry*, 604 F.3d at 440. The second is the "medical-deference rule, namely, that nonmedical jail staff can defer to the professional judgment of medical staff." *Id.*, citing *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Here, the Defendants appear to argue for the application of the second rule, but this determination would be premature, especially at the pleading stage, when "facts are in dispute" as to whether "medical staff exercised any judgment." *Id.*

The Correctional Officer Defendants did not fail to provide treatment for a wart on Ulmer's foot, as in one of the only recent cases they cite, *Daniels v. Janca*, 2019 WL 2772525, at *5 (N.D. Ill July 2, 2019). *See* Dkt. 47 at 17. Each Defendant "escapes liability only if he 'reasonably relied' on the judgment of medical professionals." *Whitsel*, 134 F.4th at 967. By "not informing staff of [Ulmer's] developing symptoms," the Correctional Officer Defendants "could not have reasonably relied on the medical judgment" of medical staff. *Id.* This includes the "blow to the head" that Ulmer had received that morning (which the Defendants fail to address in their motion to have Sprayberry, Davis, and Garcia dismissed). *Id.* "It remains to be decided whether the medical staff exercised professional judgment in treating, or not treating" Ulmer, especially at the pleading stage of this litigation. *Id.* "Doubtless when the police do take someone into custody, prevent him from getting medical care, fail to supply a replacement for that care, and thus cause his condition to deteriorate, there is a constitutional problem." *Paine v. Cason*, 678 F.3d 500, 508 (7th Cir. 2012).

The Defendants should have been aware that Ulmer, a diabetic P4 patient, was at a higher risk, yet they punitively subjected Ulmer to hours of tight physical restraints that injured him and visibly caused him significant discomfort. *Id*. ¶¶ 68-69, 157-59. Defendants Garcia, Sprayberry, and Davis witnessed Ulmer fall and strike his head on a metal pole on the morning of June 21, 2024, then failed to report his injury. *Id*. ¶¶ 74, 160. As a result, Ulmer did not receive treatment for the developing subarachnoid hemorrhage in his brain. *Id.* ¶ 75. About eight hours later, Ulmer was subjected to a brutal beating. *Id*. ¶ 106. Each of the remaining movant Defendants either participated in or witnessed this use of force. None sought additional intervention from medical providers in the critical minutes before 911 was called. *Id*. ¶¶ 165-67. Each of these medical conditions was objectively serious, even to a layperson. *See Whitsel*, 134 F.4th at 967 (correctional officer acted unreasonably by failing to notify medical staff of detainee's blow to the head); *see*

*also Paine*, 678 F.3d at 507 (manic episode while in custody "serious condition" that should have been treated with prescribed psychotropic medication; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536-38 (7th Cir. 2011) (type 2 diabetes an objectively serious health risk); *see also Mitchell v. Wisconsin*, 588 U.S. 840, 854 (2019) ("unconsciousness does not just create pressing needs; it is *itself* a medical emergency") (emphasis in original). Defendants' arguments for dismissing Count III have no merit and should be denied.

## **CONCLUSION**

The Cook County Sheriff has not taken the steps required to prevent correctional officers from continuing to brutalize those held in custody. The Constitution forbids such state-sanctioned violence against detainees within the walls of our own penal institutions. Defendants' motion improperly invites the Court to weigh facts and draw inferences against the Plaintiff, contrary to the Rule 12(b)(6) standard. It also relies on materials outside the pleadings that cannot be considered at this stage. Accepting the well-pleaded facts as true, the Complaint plausibly alleges that Defendants' conduct violated the Fourteenth Amendment and that the Sheriff's policies and practices were the moving force behind those violations. For these reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety. In the alternative, if the Court finds Count III or XIV insufficient, Plaintiff requests leave to amend under Fed. R. Civ. P. Rule 15(a)(2), to supplement and clarify his allegations as detailed above, to fully state his claims.

Dated: October 29, 2025

Respectfully submitted,

/s/ Jesse B. Guth
Jesse B. Guth #6320722
Guth Law Office, LLC
21 S. Evergreen Ave, Suite 200-112
Arlington Heights, IL 60005
(773) 820-8218
jesse@guthlawoffice.com
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

Plaintiff's attorney hereby certifies that on the 29th day of October, 2025, a copy of **Plaintiff's Opposition to Defendants' Motion to Dismiss** was filed electronically with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system and that participates in this case who are registered CM/ECF users will be served by the CM/ECF system.

Monica Burkoth (burkothm@jbltd.com)
Lisa M. McElroy (mcelroyl@jbltd.com)
JOHNSON & BELL, LTD.
33 W. Monroe St., Ste. 2700
Chicago, Illinois 60603
(312) 372-0770
*Attorneys for Defendants Cook County Sheriff, Reyes, Davis, Sprayberry, Garcia, Alvarez, Codd, Matanic, Jackson, Lesnicki, O'Hearn, Novak, Preto, Romo, Kavanaugh, Kelly, Wilks, Carr, and Hollis*

Jessica D. Rater
(jessica.ratner@cookcountysao.org)
Assistant State's Attorney
50 West Washington, Suite 2760
Chicago, IL 60602
(312) 603-1434
*Attorney for Rajkowski*

William Ragen
(William.ragen@cookcountysao.org)
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, IL 60602
(312) 603-7944
*Attorney for Cook County d/b/a Cermak Health Services, Balawander, Colon, Haq, James, Johnson, Khan, Munoz, Omodora, Sheehan, Tawadros, and Trani*

/s/ Jesse B. Guth
Jesse B. Guth #6320722
Guth Law Office, LLC
21 S. Evergreen Ave, Suite 200-112
Arlington Heights, IL 60005
(773) 820-8218
jesse@guthlawoffice.com
Attorney for Plaintiff