**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROBERT ROBINSON, as Independent Administrator of the Estate of CORY ULMER, Deceased,

Plaintiff,

v.

COOK COUNTY SHERIFF, in his official capacity; SERGEANT ENRIQUE REYES (#3379); OFFICER KARLTON DAVIS (#15430); OFFICER CHAD SPRAYBERRY (#17560); OFFICER JOSHUA GARCIA (#16401); OFFICER DANIEL ALVAREZ (#17342); OFFICER KYLE CODD (#18348); OFFICER MICHAEL MATANIC (#16451); OFFICER JASON JACKSON (#17877); OFFICER JOHN LESNICKI (#16596); OFFICER BRENT O'HEARN (#16544); OFFICER JOSHUA NOVAK (#15806); OFFICER JOHN PRETO (#17344); OFFICER MARIO RAJKOWSKI (#15651); OFFICER RAMIRO ROMO (#17159); OFFICER THOMAS KAVANAUGH (#18920); LIEUTENANT LEROY KELLY; EXECUTIVE DIRECTOR JUSTIN WILKS; DIRECTOR BRYAN CARR; ASSISTANT DIRECTOR LONNIE HOLLIS;

COOK COUNTY, ILLINOIS, a unit of local government and d/b/a COOK COUNTY HEALTH AND HOSPITALS SYSTEM and CERMAK HEALTH SERVICES OF COOK COUNTY; RINA TRANI; MARGHOOB KHAN, M.D.; LAUREN MUNOZ; AHLEAH BALAWENDER, PA-C; BUNMI OMODARA, R.N.; SOUMYA JAMES, R.N.; ANITA JOHNSON; GARY SHEEHAN, RN; YASER HAQ, M.D; MINA TAWADROS, M.D.; and LENA COLON,

Defendants.

Case No. 25-cv-06643

**JURY TRIAL DEMANDED**

**<u>ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AT LAW BY DEFENDANTS LIEUTENANT LEROY KELLY, EXECUTIVE DIRECTOR JUSTIN WILKS, DIRECTOR BRYAN CARR, AND ASSISTANT DIRECTOR LONNIE HOLLIS</u>**

1. This is an action for damages brought pursuant to 42 U.S.C. § 1983, the Illinois Wrongful Death Act (740 ILCS 180/1, et seq.), and the Illinois Survival Act (755 ILCS 5/27-6) arising from the death of CORY ULMER, a 41-year-old pretrial detainee who died on June 21, 2024, while in custody at the Cook County Jail. ULMER was arrested on June 20, 2024, for an electronic monitoring violation. During his intake and screening at the Jail, ULMER was classified as "P4," the Jail's highest psychiatric classification.

**ANSWER: Defendants admit that Plaintiff brings his complaint pursuant to the Illinois Wrongful Death Act and the Illinois Survival Act. Defendants admit that Ulmer was a pre-trial detainee who died on June 21, 2024. On information and belief, Defendants admit that Ulmer was arrested on June 20, 2024, for an electronic monitoring violation. Defendants lack sufficient information to admit or deny that during his intake and screening at the Jail, Ulmer was classified as "P4," the Jail's highest psychiatric classification. Defendants deny each and every remaining allegation contained in this paragraph.**

2. ULMER was detained for approximately 36 hours in a holding cell without a bed, toilet, or sink. During that time, correctional officers subjected ULMER to prolonged periods of bodily restraint, shackling him inside a holding cell. ULMER was not administered any of his prescribed psychotropic medication and was given only one dose of his diabetes medication.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

3. On June 21, 2024, correctional officers used excessive force against ULMER in two separate incidents. During the first use-of-force incident, three officers caused ULMER to fall and strike his head on a metal pole outside of his cell. The correctional officers involved did not

report the incident or ULMER's injury. Autopsy evidence revealed ULMER suffered a traumatic head injury, which led to a subarachnoid brain hemorrhage.

**ANSWER**: **Defendants lack sufficient information to admit or deny that autopsy evidence revealed Ulmer suffered a traumatic head injury, which led to a subarachnoid brain hemorrhage. Defendants deny each and every remaining allegation contained in this paragraph.**

4. The second use-of-force incident occurred approximately eight hours later, and the on-duty sergeant deliberately deactivated his body-worn camera. Numerous correctional officers dragged ULMER out of view of surveillance cameras and beat him while he was restrained with handcuffs and leg shackles. ULMER was then injected with sedatives and placed into a restraint chair. After ULMER was discovered to be non-responsive, an employee of CERMAK HEALTH SERVICES eventually dialed 9-1-1. EMS access to ULMER's location was obstructed for almost 20 minutes.

**ANSWER**: **Defendants lack sufficient information to admit or deny that Ulmer was injected with sedatives or that he was placed into a restraint chair. Defendants lack sufficient information to admit or deny that after Ulmer was discovered to be non-responsive, that an employee of CERMAK HEALTH SERVICES eventually dialed 9-1-1, and that EMS access to ULMER's location was obstructed for almost 20 minutes. Defendants deny the remaining allegations contained in this paragraph.**

5. ULMER was declared deceased at Mount Sinai Hospital at 4:27 PM on June 21, 2024. For hours after ULMER's in-custody death, the COOK COUNTY SHERIFF refused to notify the Cook County Medical Examiner or allow ULMER's body to be transported to the Mount Sinai Hospital morgue. As a result, the Cook County Medical Examiner investigator did not arrive

at the Jail until after midnight. By that time, the scene at CERMAK HEALTH SERVICES had been cleared. The Cook County Medical Examiner ruled ULMER's death a homicide.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

6. This suit seeks to redress the deprivation under color of law of the rights of CORY ULMER as secured by the Fourteenth Amendment to the United States Constitution and claims under the laws of the State of Illinois by the actions, omissions, policies, and procedures of the COOK COUNTY SHERIFF, COOK COUNTY through CERMAK HEALTH SERVICES, as well as the employees and agents of each.

**ANSWER**: **Defendants admit that plaintiff's complaint seemingly seeks to redress the alleged deprivation of Mr. Ulmer's constitutional rights. Defendants deny the remaining allegations contained in this paragraph.**

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 1331. This Court has supplementary jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**ANSWER**: **Defendants admit the allegations contained in this paragraph.**

8. Venue is proper under 28 U.S.C. § 1391(b), as the events giving rise to the claims asserted herein all occurred within Cook County, Illinois, located in the Northern District of Illinois, Eastern Division.

**ANSWER**: **Defendants admit the allegations contained in this paragraph.**

## PARTIES

9. CORY ULMER died at the age of forty-one (41) on June 21, 2024, while a pre-trial detainee in the Cook County Department of Corrections at the Cook County Jail (the "Jail") in Chicago, Illinois. At the time of his death, ULMER was a Black male, a citizen of the United States, and resided in Chicago, Illinois.

**ANSWER**: **On information and belief, Defendants admit the allegations contained in this paragraph.**

10. The Plaintiff, ROBERT ROBINSON, has been ULMER's stepfather since 1990, when he married ULMER's mother, who is deceased. ROBINSON is the father of ULMER's two sisters, a citizen of the United States, and currently resides in Naperville, Illinois.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

11. On August 7, 2024, by order of the Circuit Court of Cook County (case no. 24P4592), ROBINSON was lawfully and duly appointed Independent Administrator of the Estate of CORY ULMER. ROBINSON brings this suit on behalf of the Estate and its beneficiaries.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

12. At all relevant times relevant to this case, Defendant Tom Dart, the COOK COUNTY SHERIFF, served as the elected Sheriff of Cook County and acted under color of law. The COOK COUNTY SHERIFF is the warden of the Jail and was responsible for the operations, policies, and/or management of the Cook County Sheriff's Office and the Cook County Department of Corrections. The COOK COUNTY SHERIFF was also responsible for the hiring and training of all personnel employed by the Cook County Sheriff's Office, for the safety and

security of all detainees at the Jail, and for ensuring detainees received adequate medical care. At all relevant times, the COOK COUNTY SHERIFF was the final policy maker for the Cook County Sheriff's Office and the Jail. The COOK COUNTY SHERIFF is being sued in his official capacity.

**ANSWER**: **Defendants admit only that the Cook County Sheriff has certain duties and responsibilities defined by law, denies that Plaintiff has accurately delineated those duties, and denies the remaining allegations.**

13. At all relevant times, Defendant COOK COUNTY was and is a unit of local government duly incorporated under the laws of the State of Illinois. COOK COUNTY owns and finances the Jail.

**ANSWER**: **Defendants admit only that the County of Cook is a unit of local government duly incorporated under the laws of the State of Illinois. Defendants lack sufficient information to admit or deny the remaining allegations contained in this paragraph.**

14. At all relevant times, COOK COUNTY through the Cook County Health and Hospitals System ("CCHHS") and its various facilities, including CERMAK HEALTH SERVICES of Cook County, provided medical services. Specifically, COOK COUNTY owned, operated, maintained, managed, controlled, funded, staffed, and/or employed personnel at CCHHS and its facility CERMAK HEALTH SERVICES, which is and was a medical facility serving the detainees in the Jail, and provided medical services to patients therein.

**ANSWER**: **On information and belief, Defendants admit that at all relevant times, COOK COUNTY through the Cook County Health and Hospitals System ("CCHHS") including CERMAK HEALTH SERVICES of Cook County, provided medical services at**

**the Jail. Defendants lack sufficient information to admit or deny the remaining allegations contained in this paragraph.**

15. At all relevant times, the COOK COUNTY SHERIFF agreed to work collaboratively with COOK COUNTY through CERMAK HEALTH SERVICES to ensure their respective agents and employees provided medical and psychiatric care to detainees in the Jail.

**ANSWER**: **Defendants admit only that Cook County Sheriff and Cermak Health Service operate under an inter-agency agreement to provide medical and psychiatric care to detainees in the Jail, and denies the remaining allegations contained in this paragraph.**

16. At all relevant times, SERGEANT ENRIQUE REYES (#3379) was a correctional sergeant in the Jail. SERGEANT REYES was regularly assigned as the Building Sergeant responsible for supervising the CERMAK HEALTH SERVICES building. He is being sued in his individual capacity.

**ANSWER**: **On information and belief, Defendants admit that at all relevant times, Sergeant Enrique Reyes (#3379) was employed by the Cook County Sheriff. Defendants admit that Defendant Enrique Reyes is being sued in his individual capacity. Defendants lack sufficient information to admit or deny the remaining allegations contained in this paragraph.**

17. At all relevant times, OFFICER KARLTON DAVIS (#15430); OFFICER CHAD SPRAYBERRY (#17560); OFFICER JOSHUA GARCIA (#16401); OFFICER DANIEL ALVAREZ (#17342); OFFICER KYLE CODD (#18348); OFFICER MICHAEL MATANIC (#16451); OFFICER JASON JACKSON (#17877); OFFICER JOHN LESNICKI (#16596); OFFICER BRENT O'HEARN (#16544); OFFICER JOSHUA NOVAK (#15806); OFFICER JOHN PRETO (#17344); OFFICER MARIO RAJKOWSKI (#15651); OFFICER RAMIRO

ROMO (#17159); OFFICER THOMAS KAVANAUGH (#18920) were correctional officers at the Jail. Each is being sued in his individual capacity.

**ANSWER**: **On information and belief, Defendants admit the allegations contained in this paragraph.**

18 At all relevant times, LIEUTENANT LEROY KELLY, JR. was a correctional lieutenant in the Jail. He is being sued in his individual capacity.

**ANSWER**: **Admitted.**

19. At all relevant times, EXECUTIVE DIRECTOR JUSTIN WILKS was employed by the COOK COUNTY SHERIFF as Executive Director of Custodial Investigations. He is being sued in his individual capacity.

**ANSWER**: **Denied.**

20. At all relevant times, DIRECTOR BRYAN CARR was employed by the COOK COUNTY SHERIFF as Director of Custodial Investigations. He is being sued in his individual capacity.

**ANSWER**: **Admitted.**

21. At all relevant times, ASSISTANT DIRECTOR LONNIE HOLLIS was employed by the COOK COUNTY SHERIFF as Assistant Executive Director. He is being sued in his individual capacity.

**ANSWER**: **Admitted.**

22. At all relevant times, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER

KAVANAUGH (collectively, the "SHERIFF'S OFFICER DEFENDANTS"), along with LIEUTENANT LEROY KELLY, EXECUTIVE DIRECTOR JUSTIN WILKS, DIRECTOR BRYAN CARR, and ASSISTANT DIRECTOR LONNIE HOLLIS, were employees of the COOK COUNTY SHERIFF. At all relevant times, the SHERIFF'S OFFICER DEFENDANTS, LIEUTENANT KELLY, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS were each engaged in the complained of conduct while acting within the scope of their employment and under color of state law.

**ANSWER**: **Defendants admit only that, at all relevant times, they were employed by the Cook County Sheriff and acting within the scope of their employment. Plaintiff's allegation that defendants were acting under color of state law states a legal conclusion, not a factual allegation, and no response is required by law. To the extent a response is necessary, Defendants deny the allegation. Defendants lack sufficient information to admit or deny the remaining allegations contained in this paragraph.**

23. At all relevant times to the events at issue in this case, the COOK COUNTY SHERIFF promulgated regulations, policies and procedures, and was subject to state laws, federal laws, and institutional guidelines, regarding the training, supervision, and discipline of the Jail and its correctional officers that concerned, *inter alia:* (1) detainee intake procedure, (2) transporting detainees between cell blocks and/or to and from cells within the same cell block; (3) communicating or failing to communicate detainee requests; (4) the use of force; (5) the use of restraints; and (6) properly filling out Incident and Use of Force Reports; (7) preservation of evidence, and (8) requirements surrounding body worn cameras. The COOK COUNTY SHERIFF's policies were implemented by and through its employees, including each of the

SHERIFF'S OFFICER DEFENDANTS, LIEUTENANT KELLY, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

24. At all relevant times, RINA TRANI and LENA COLON were paramedics in the State of Illinois working at CERMAK HEALTH SERVICES at the Jail. Each is being sued in their individual capacity.

**ANSWER**: **Defendants lack sufficient information to admit or deny that at all relevant times, RINA TRANI and LENA COLON were paramedics in the State of Illinois working at CERMAK HEALTH SERVICES at the Jail. Defendants admit that each is being sued in their individual capacity.**

25. At all relevant times, LAUREN MUNOZ and ANITA JOHNSON were working as Mental Health Specialists at CERMAK HEALTH SERVICES at the Jail. Each is being sued in their individual capacity.

**ANSWER**: **Defendants lack sufficient information to admit or deny that at all relevant times, LAUREN MUNOZ and ANITA JOHNSON were working as Mental Health Specialists at CERMAK HEALTH SERVICES at the Jail. Defendants admit that each is being sued in their individual capacity.**

26. At all relevant times, AHLEAH BALAWENDER, PA-C ("Balawender"), also known as AHLEAH SALEFSKI, was a physician's assistant working at CERMAK HEALTH SERVICES at the Jail. She is being sued in her individual capacity.

**ANSWER**: **Defendants lack sufficient information to admit or deny that at all relevant times, AHLEAH BALAWENDER, PA-C ("Balawender"), also known as AHLEAH**

**SALEFSKI, was a physician's assistant working at CERMAK HEALTH SERVICES at the Jail. Defendants admit that she is being sued in her individual capacity.**

27. At all relevant times, BUNMI OMODARA, R.N., SOUMYA JAMES, R.N., and GARY SHEEHAN, R.N. were registered professional nurses in the State of Illinois working at CERMAK HEALTH SERVICES at the Jail. Each is being sued in their individual capacity.

**ANSWER**: **Defendants lack sufficient information to admit or deny that at all relevant times, BUNMI OMODARA, R.N., SOUMYA JAMES, R.N., and GARY SHEEHAN, R.N. were registered professional nurses in the State of Illinois working at CERMAK HEALTH SERVICES at the Jail. Defendants admit that each is being sued in their individual capacity.**

28. At all relevant times, MARGHOOB KHAN, M.D., YASER HAQ, M.D., and MINA TAWADROS, M.D. were licensed physicians in the State of Illinois working at CERMAK HEALTH SERVICES at the Jail. Each is being sued in their individual capacity.

**ANSWER**: **Defendants lack sufficient information to admit or deny that at all relevant times, MARGHOOB KHAN, M.D., YASER HAQ, M.D., and MINA TAWADROS, M.D. were licensed physicians in the State of Illinois working at CERMAK HEALTH SERVICES at the Jail. Defendants admit that each is being sued in their individual capacity.**

29. At all relevant times, TRANI, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, KHAN, HAQ, and TAWADROS (collectively, the "CERMAK HEALTH DEFENDANTS") were employees of COOK COUNTY through CERMAK HEALTH SERVICES. At all relevant times, each of the CERMAK HEALTH DEFENDANTS were engaged in the complained of conduct while acting within the scope of their employment and under color of state law.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

30. At all relevant times, the COOK COUNTY SHERIFF and the SHERIFF'S OFFICER DEFENDANTS authored, or should have authored, reports outlining use of force, incidents, accidents, field notes, or other records containing information depicting their personal involvement and contact relating to ULMER's time in custody between June 20 and June 21, 2024.

**ANSWER**: **Defendants lack sufficient information to admit or deny the remaining allegations contained in this paragraph.**

31. At all relevant times, the SHERIFF OFFICER DEFENDANTS were issued body-worn cameras with audio and video recording capability or are depicted on video cameras located throughout the jails, including tier videos, between June 20 and June 21, 2024.

**ANSWER**: **Defendants admit that at all relevant times, certain Sheriff officer defendants were issued body-worn cameras with audio and video recording capability, and that there are video cameras located throughout the jail. Defendants lack sufficient information to admit or deny the remaining allegations contained in this paragraph.**

32. At all relevant times, COOK COUNTY, through its employees and agents working at CERMAK HEALTH SERVICES, authored or should have authored medical records, including medication administration records, consultations, restriction notices, or evaluations reflecting physical and mental health examinations which were created at or near the time of observation, containing diagnoses and impressions relating to observation and/or depicting ULMER's time in custody between June 20 and June 21, 2024.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

33. At all relevant times, the COOK COUNTY SHERIFF was party to one or more Inter-Agency Agreements with COOK COUNTY requiring each of them to coordinate to deliver healthcare and mental healthcare to detainees at the Jail.

**ANSWER**: **Defendants admit that certain inter-agency agreements between the Sheriff and Cook County contemplate the coordination and provision of medical and psychiatric care to detainees at the Jail, and deny the remaining allegations contained in this paragraph.**

**COMMON ALLEGATIONS**

34. On January 4, 2023, CORY ULMER was arrested by the Chicago Police Department and remanded to the custody of the Jail.

**ANSWER**: **On information and belief, Defendants admit the allegations contained in this paragraph.**

35. Upon his admission into the Jail on or around January 6, 2023, ULMER underwent intake screening and evaluation by employees of the COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES, which included documentation of ULMER's medical and psychiatric history; his mental health diagnoses of bipolar disorder and paranoia; his type 2 diabetes, which was non-insulin-dependent; as well as his prescribed medications and symptoms.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

36. Between January 6, 2023, and March 17, 2023, ULMER remained in custody at the Jail. During that time, ULMER received treatment from numerous CERMAK HEALTH SERVICES employees, including Defendants RINA TRANI; MARGHOOB KHAN, M.D.; AHLEAH BALAWENDER, PA-C; ANITA JOHNSON; and SOUMYA JAMES, R.N.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

37. On or around March 17, 2023, ULMER was granted pretrial release and placed on the COOK COUNTY SHERIFF's electronic monitoring program. Upon discharge, ULMER was given prescriptions for metformin, a medication used to treat high blood sugar in type-2 diabetics, as well as prescriptions for risperidone and carbamazepine, two medications for bipolar disorder.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

38. At all relevant times, ULMER was considered a pre-trial detainee, as he had not been convicted of any of the allegations in his underlying criminal case.

**ANSWER: On information and belief, Defendants admit the allegations contained in this paragraph.**

39. On June 20, 2024, around 1:45 AM, several Electronic Monitoring Unit Officers of the COOK COUNTY SHERIFF took ULMER into custody near Midway International Airport for allegedly violating his electronic monitoring conditions.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

40. During the interaction, the officers stated that they believed ULMER was "off his meds" and discussed whether to return him home or to the Jail. Eventually, a decision was made to transport ULMER to the Jail so he could be given medication if needed.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

41. ULMER asked the COOK COUNTY SHERIFF's Officers if they were trying to kill him. Less than 48 hours later, ULMER was dead.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

42. The responding officers classified ULMER as a "P3" patient. Psychiatric patients are assigned a value of one through four, with P4 representing the most severe psychiatric issues.

**ANSWER**: **Defendants deny the allegations contained in this paragraph.**

43. At approximately 6:30 AM on June 20, 2024, CERMAK HEALTH SERVICES paramedic RINA TRANI performed an initial intake screen on ULMER.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

44. TRANI confirmed ULMER's previous mental health diagnoses of bipolar disorder and paranoia, as well as his prescriptions of metformin and "psych meds." TRANI listed every problem in ULMER's history on his prior charts, including a pneumonia diagnosis from 2010, as an "active problem." TRANI also took ULMER's vitals.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

45. Approximately one hour later, CERMAK HEALTH SERVICES physician MARGHOOB KHAN, M.D., performed a medical evaluation of ULMER. KHAN noted that ULMER denied any chest pain, shortness of breath, dizziness, headache, abdominal pain, nausea, vomiting, or any other complaints. KHAN prescribed ULMER metformin and two additional PRN (as-needed) IV medications for his diabetes.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

46. KHAN noted ULMER's history of psychiatric diagnoses and reviewed ULMER's current medication list. However, KHAN did not prescribe any psychotropic interventions for ULMER or order that ULMER's current prescription of risperidone be continued.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

47. At approximately 8:19 AM, CERMAK HEALTH SERVICES physician's assistant AHLEAH BALAWENDER, PA-C, entered an order that ULMER be classified as a P4, receive a "high" mental health level of care, and be transferred to CERMAK HEALTH SERVICES. BALAWENDER did not enter any notes documenting a face-to-face encounter with or assessment of ULMER. BALAWENDER did not prescribe ULMER any medication on June 20, 2024.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

48. At approximately 9:00 AM, CERMAK HEALTH SERVICES Mental Health Specialist LAUREN MUNOZ performed a mental health assessment on ULMER. MUNOZ recorded that, when ULMER arrived at her office, it appeared to her that his head, face, and shirt were wet. MUNOZ reported that ULMER informed her that the man in the bullpen next to him had "thrown piss on him" and that the CCDOC had confirmed ULMER's account to her. MUNOZ also reviewed ULMER's diagnostic and medication history, including his risperidone prescription.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

49. On the morning of June 20, 2024, when ULMER was discharged from the CERMAK HEALTH SERVICES urgent care after his initial screenings, no provider had recorded any signs of injury on ULMER's head, wrists, ankles, or anywhere else on his body.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

50. At no time during these assessments of ULMER did TRANI, KHAN, MUNOZ, or BALAWENDER note concerns regarding drug/alcohol abuse or suicidal/homicidal ideation.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

51. After these initial assessments, ULMER's classification was upgraded from "P3" to "P4" (the highest level). ULMER was scheduled to be admitted to P4 housing in the Psychiatric Specialty Care Unit of Cermak (PCSU) for "stabilization and med restart."

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

52. The PSCU provides 24-hour nursing and mental health staff, and detainees housed in the PSCU are exempt from discipline inside of the Jail.

**ANSWER**: **Defendants lack sufficient information to admit or deny that PSCU provides 24-hour nursing and mental health staff. Defendants deny the remaining allegations contained in this paragraph.**

53. Despite ULMER'S known mental health diagnoses and his upgrade from a P3 to P4, no CERMAK HEALTH SERVICES provider prescribed or administered any treatment to ULMER on June 20, 2024, to address his acute psychiatric symptoms.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

54. If antipsychotic medications such as risperidone are stopped suddenly, symptoms such as anxiety, agitation, insomnia, hallucinations, and rebound psychosis can occur.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

55. After this intake medical screening process, each of the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS who interacted with ULMER knew or should have known his medical needs and that he had been given a psychiatric classification requiring the highest level of care and constant monitoring.

**ANSWER: Defendants lack insufficient information to admit or deny the allegations that after Ulmer's intake medical screening process, each of the CERMAK HEALTH DEFENDANTS who interacted with ULMER, knew or should have known his medical needs and that he had been given a psychiatric classification requiring the highest level of care and constant monitoring. Defendants deny the remaining allegations contained in this paragraph.**

56. However, throughout June 20, 2024, and June 21, 2024, ULMER was not housed in the PSCU but instead kept in the bullpen in the basement of CERMAK HEALTH SERVICES adjacent to its emergency room/urgent care area. ULMER was detained in a small holding cell that lacked sleeping facilities, a toilet, and a sink.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

57. During this two-day period, ULMER was restrained with handcuffs, leg shackles, or a combination of both, even though no good penological or medical reason existed to force ULMER to endure bodily restraints when ULMER was alone in a secure holding cell. The restraints on ULMER were so tight as to cause injury and impair normal blood flow, causing pain, swelling, bruising, lacerations, and circulatory compromise in his extremities.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

58. At approximately 12:35 PM on June 20, SOUMYA JAMES, R.N. administered the first and only dose of metformin that ULMER received during his two days at the Jail.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

59. At some unknown time prior to 3:00 PM on June 20, 2024, ULMER was placed in steel handcuffs.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

60. Around 8:00 PM on June 20, 2024, ULMER repeatedly tried to speak with an unknown individual outside of his cell. Approximately fifteen minutes later, ULMER eliminated waste on the floor of his cell.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

61. Several minutes later, at approximately 8:16 PM, several correctional officers, including OFFICER CODD, shackled ULMER's left leg to the bench in his cell. A correctional

officer cleaned the feces from the floor and exited the cell without removing ULMER's handcuffs or leg shackle.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

62. OFFICER CODD and the other correctional officers left ULMER shackled to the bench for hours in retaliation or as punishment for ULMER's act of eliminating on the floor.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

63. There was no legitimate non-punitive purpose for these restraints, which were not applied to prevent self-injury, injury to others, property damage, or other dangerous behavior, nor were they applied to control ULMER during movement and transportation.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

64. During this incident on June 20, 2024, SERGEANT REYES was the Building Sergeant supervising OFFICER CODD and the other correctional officers assigned to CERMAK HEALTH SERVICES. On this date, SERGEANT REYES had contact with ULMER and knew that ULMER was a P4.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

65. At approximately 9:35 PM on June 20, 2024, Mental Health Specialist ANITA JOHNSON entered a note stating ULMER was awaiting transfer to the PSCU and was currently housed in the CERMAK HEALTH SERVICES staging area. JOHNSON indicated that mental

health services would continue to monitor ULMER. JOHNSON does not state that she actually saw, spoke to, or assessed ULMER, nor does she mention his restraints.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

66. Between June 20, 2024, and June 21, 2024, every one of the SHERIFF'S OFFICER DEFENDANTS and CERMAK HEALTH DEFENDANTS who observed, monitored, or interacted with ULMER while he was restrained knew or should have known that the prolonged use of tight restraints posed a serious risk of physical harm, especially for a diabetic. Despite this, these Defendants failed to loosen, remove, or seek individuals to medically assess the restraints.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

67. At approximately 5:24 AM on June 21, 2024, ULMER's leg shackles were removed, and he was escorted to the bathroom. Approximately twenty minutes later, ULMER was brought back to his cell by five correctional officers, with a sixth officer bringing shackles. ULMER's leg shackles were re-applied, and his handcuffs were removed.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

68. Upon ULMER's return from the bathroom, he exhibited behavior that was classified as "bizarre," such as dancing in his cell. Around 6:07 AM, correctional officers entered Ulmer's cell, again handcuffed him, and removed his leg shackles. After a conversation, officers then shackled ULMER's leg to the bench of his cell.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

69. ULMER exhibited signs that these restraints were causing him significant pain. ULMER performed actions such as attempting to slide his handcuffs off his wrists, chewing on his handcuffs, laying and rolling on the ground, and knocking on his cell wall.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

70. Around 6:53 AM on June 21, 2024, several correctional officers—including OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA—entered ULMER's cell and removed his handcuffs. After a brief discussion, these correctional officers again handcuffed ULMER and removed his leg shackles.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

71. OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA removed ULMER from the holding cell and escorted him out of the bullpen holding area at 6:56 AM.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

72. There is only one surveillance camera in the emergency room/urgent care area of CERMAK HEALTH SERVICES, which faces toward the door leading into the bullpen.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

73. It is widespread knowledge among the COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES employees at the Jail that there are no surveillance cameras recording the emergency room of CERMAK HEALTH SERVICES beyond a small area near the entry door.

**ANSWER**: **Defendants deny the allegations contained in this paragraph.**

74. At approximately 6:57 AM, OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA brought ULMER back toward his cell. These officers used or were witness to the application of excessive force, causing ULMER to fall to the ground and strike his head on a metal pole outside of the cell wall. As ULMER lay on the ground, OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA dragged him back into his cell and secured the door.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

75. During the autopsy performed after ULMER's death, the Cook County Medical Examiner found that ULMER had suffered a subarachnoid brain hemorrhage and a hemorrhage in the soft tissue under the skin of his head.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

76. This brain bleed constituted a serious and life-threatening medical emergency. Common symptoms of a subarachnoid brain hemorrhage include severe "thunderclap" headaches, decreased consciousness and alertness, mood and personality changes, eye discomfort in bright light, and muscle aches.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

77. OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, and other COOK COUNTY SHERIFF employees failed to report this use of force.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

78. OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA acted with an intentional disregard for ULMER's safety and well-being by failing to report ULMER's fall and head injury so he could receive medical treatment.

**<u>ANSWER</u>: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

79. As a pre-trial detainee, ULMER was entirely dependent on the Defendants for his medical and psychiatric care and well-being. ULMER could not seek outside sources of aid.

**<u>ANSWER</u>: Defendants deny that Ulmer was entirely dependent on them for his medical and psychiatric care and well-being. Defendants lack sufficient information to admit or deny the remaining allegations contained in this paragraph.**

80. After the 6:57 AM use-of-force incident, OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA failed to remove the leg shackle that remained secured to the bench in ULMER's cell.

**<u>ANSWER</u>: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

81. Between approximately 6:57 AM and 3:14 PM on June 21, 2024, ULMER remained handcuffed in the bullpen holding cell.

**<u>ANSWER</u>: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

82. At approximately 8:19 AM on June 21, 2024, MUNOZ reported that ULMER had "no due psych meds" even though no psychotropic medication had been prescribed. MUNOZ did not record any notes indicating that she actually spoke to or assessed ULMER on June 21, 2024.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

83. About three hours later, around 11:00 AM, BALAWENDER reported performing a new patient evaluation on ULMER. Due to "unpredictable and aggressive behaviors," BALAWENDER spoke to ULMER while he was in his cell in the bullpen. BALAWENDER reported that ULMER was "minimally cooperative" with the interview, was confused about the date, and was having auditory hallucinations.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

84. BALAWENDER ordered ULMER be given risperidone and Depakote. BALAWENDER also ordered that a "B52" sedative injection containing lorazepam, diphenhydramine, and haloperidol be administered to ULMER PRN (as needed). BALAWENDER did not determine or state in writing whether ULMER had the capacity to make a reasoned decision about receiving this medication, nor what information she provided him.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

85. ULMER was not administered risperidone or any other treatment after BALAWENDER's evaluation, despite obvious signs that his mental state was deteriorating.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

86. On or around 3:15 PM, SERGEANT REYES performed his initial rounds and observed some garbage in ULMER's cell, as well as the shackle attached to the bench that was left behind that morning by OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA.

**<u>ANSWER</u>: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

87. SERGEANT REYES called for assistance from the other correctional officers assigned to the holding cells—namely, OFFICER ALVAREZ, OFFICER CODD, and OFFICER MATANIC—to remove these items from ULMER's cell.

**<u>ANSWER</u>: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

88. SERGEANT REYES was wearing a body-worn camera when he entered ULMER's cell (Axon BWC X60A6881H). This body-worn camera was recording video, but SERGEANT REYES had muted the audio.

**<u>ANSWER</u>: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

89. When SERGEANT REYES, OFFICER ALVAREZ, OFFICER CODD, and OFFICER MATANIC approached, ULMER was sitting on the bench closest to the cell door in a hunched position. ULMER moved to the rear of the cell and cowered as the officers entered. OFFICER ALVAREZ, OFFICER CODD, and OFFICER MATANIC held ULMER as SERGEANT REYES removed the shackle from the bench. As the officers left the cell, ULMER attempted to exit behind them.

**<u>ANSWER</u>: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

90. SERGEANT REYES, OFFICER ALVAREZ, OFFICER CODD, and OFFICER MATANIC tackled ULMER to the floor. OFFICER RAJKOWSKI, OFFICER ROMO, OFFICER LESNICKI responded to assist. The officers rolled ULMER onto his stomach and placed leg

shackles on him. At this time, SERGEANT REYES unmuted his body-worn camera. Nurse SHEEHAN entered the bullpen and stood nearby watching.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

91. The officers pulled ULMER to his knees. SERGEANT REYES gripped ULMER by the sides of his neck and ordered OFFICER ALVAREZ to bring a restraint chair.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

92. SERGEANT REYES ordered the officers to "drag" ULMER to the nearby emergency room area approximately 20 feet across the concrete floor to CERMAK HEALTH SERVICES. SERGEANT REYES, OFFICER RAJKOWSKI, OFFICER CODD, OFFICER MATANIC, and OFFICER LESNICKI dragged ULMER approximately twenty feet across the concrete floor, causing his shirt to pull up and exposing his bare skin to the floor.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

93. During the time ULMER was unable to stand and/or passively resisting, SERGEANT REYES issued commands almost exclusively to the other officers, not to ULMER.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

94. Upon entering the emergency room of CERMAK HEALTH SERVICES, SERGEANT REYES deactivated his body-worn camera. Before the available BWC ends at timestamp 2024-06-21 15:18:36, the video shows the correctional officers releasing ULMER and standing up as ULMER lies motionless on the floor, while Nurse SHEEHAN stands nearby.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

95. SERGEANT REYES later told Illinois State Police investigators that he had turned his camera off "for privacy reasons of medical patients" as they entered the CERMAK HEALTH SERVICES emergency room. SERGEANT REYES claimed this action was "normal protocol."

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

96. OFFICER ALVAREZ and OFFICER ROMO brought the restraint chair into the CERMAK HEALTH SERVICES emergency room approximately ten seconds later. OFFICER JACKSON and OFFICER O'HEARN responded to the radio call of SERGEANT REYES shortly after SERGEANT REYES turned off his body-worn camera.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

97. At approximately 3:20 PM, the correctional officers pulled ULMER away from the door and to the rear of the CERMAK HEALTH SERVICES emergency room area, out of view of the single security camera.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

98. At this time, ULMER yelled that he needed a doctor.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

99. Several of the SHERIFF'S OFFICER DEFENDANTS, including SERGEANT REYES, OFFICER MATANIC, OFFICER JACKSON, and OFFICER O'HEARN, proceeded to

beat ULMER while he was handcuffed and shackled on the ground. SERGEANT REYES kicked and hit ULMER with closed fists. OFFICER JACKSON kicked ULMER in the head numerous times, punched ULMER in the head, and hit ULMER in the abdomen with his knee. OFFICER O'HEARN struck ULMER in the leg. Nurse SHEEHAN witnessed this abuse of ULMER and moved around the corner, out of view.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

100. Around this time, OFFICER NOVAK, OFFICER PRETO, OFFICER KAVANAUGH, and Nurse BUNMI OMODARA, R.N. arrived on scene.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

101. When Illinois State Police investigators questioned SERGEANT REYES as to why he did not reactivate his body-worn camera, SERGEANT REYES told them that ULMER had head-butted off his body-worn camera. SERGEANT REYES initially reported that he did not know where the BWC had gone after ULMER had knocked it off his chest. Later, SERGEANT REYES stated he had found the body-worn camera on the floor under a gurney in the ER.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

102. A General Progress Report filled out during the COOK COUNTY SHERIFF's internal investigation of ULMER's in-custody death on June 21, 2024, by Officer Gina Perez #6350 states that the BWC of SERGEANT REYES for 1521-36 hours was reviewed. The handwritten note provides: "UOF grabs ofc. He's secured and brought into restraint chair.

(X60A6881H) breathing fine." The COOK COUNTY SHERIFF did not provide this second BWC video to the Illinois State Police.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

103. After SERGEANT REYES and the other officers beat ULMER, SERGEANT REYES called Nurse SHEEHAN back into the room. SERGEANT REYES stated that he believed ULMER needed emergency medication.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

104. At approximately 3:29 PM, Nurse SHEEHAN spoke with YASER HAQ, M.D., who ordered that ULMER be injected with a "B52" cocktail of intramuscular sedatives that included haloperidol, lorazepam, and diphenhydramine. HAQ did not observe or witness ULMER's condition, yet authorized an injection be administered. HAQ did not order or evaluate care and treatment for the brutality that occurred but instead turned a blind eye to the conduct.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

105. Nurse SHEEHAN injected ULMER's buttocks with this medication and the officers placed ULMER in a restraint chair.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

106. After the shot was administered, ULMER was limp "like a ragdoll" and foaming at the mouth.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

107. The Ward Clerk of CERMAK HEALTH SERVICES called 9-1-1 at approximately 3:38 PM. ULMER was removed from the restraint chair and placed on a stretcher.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

108. SERGEANT REYES, the supervising officer and primary handling sworn member, failed to contact EMS or relay information to EMS personnel, the Cook County Communications Center, or other COOK COUNTY SHERIFF personnel at the Jail to ensure an appropriate and timely emergency response and failed to notify medical personnel that ULMER had been beaten.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

109. On June 21, 2024, at approximately 3:39 PM, the Chicago Fire Department dispatched Ambulance 67 to the Jail. They arrived at 3:46 PM. The Chicago Fire Department Ambulance was delayed outside the entrance gate to Division 8, and upon their entrance past the first gate, they were delayed again as COOK COUNTY SHERIFF employees radioed for ULMER's location. CFD paramedics did not reach ULMER until approximately 4:01 PM, more than twenty minutes after 9-1-1 had been activated.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

110. CERMAK HEALTH SERVICES employee Defendants TAWADROS, SHEEHAN, COLON, OMODARA, and JOHNSON observed and/or responded to the SHERIFF OFFICER DEFENDANTS' actions between 3:20 and 4:10 P.M. on June 21, 2024.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

111. OFFICER PRETO, OFFICER O'HEARN, OFFICER RAJKOWSKI, OFFICER KAVANAUGH, and/or OFFICER LESNICKI assisted medical staff.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

112. TAWADROS had worked a 24-hour shift prior to this occurrence, which impacted his medical judgment, skill, and ability.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

113. At 4:17 PM, Chicago Fire Department's paramedics transported ULMER from the Jail to Mount Sinai Hospital. They arrived at 4:22 PM, and ULMER was pronounced deceased just five minutes later, at 4:27 PM on June 21, 2024.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

114. SERGEANT REYES notified COOK COUNTY SHERIFF through EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and/or ASSISTANT DIRECTOR HOLLIS. SERGEANT REYES was ordered to dock his body-worn camera and start a report.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

115. SERGEANT REYES reviewed his body-worn camera before writing the report.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

116. Providers at Mount Sinai Hospital charted most notes from their encounter with ULMER on paper. Mount Sinai Hospital, through its records transmittal service MRO, failed to produce the copies of the paper copies charts despite receiving all authorizations and details.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

117. Around 8:42 PM, Defendant LIEUTENANT KELLY instructed the COOK COUNTY SHERIFF Officers at ULMER's bedside and Mount Sinai Hospital staff that ULMER should not be transported down to the morgue, as there had been a previous incident where an inmate was placed in the morgue and "someone removed the body from the back entrance." LIEUTENANT KELLY requested "one more hour" before ULMER's body was transported. At approximately 10:00 PM, ASSISTANT DIRECTOR HOLLIS repeated the order that ULMER should not be brought to the morgue.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

118. The Cook County Medical Examiner was not contacted by any of the law enforcement officers present but instead was contacted by Mount Sinai Hospital Registered Nurse Susan Cazares around 10:23 PM, after she repeatedly followed up with the COOK COUNTY SHERIFF's officers about reporting ULMER's death and bringing his body to the morgue.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

119. This delay violated the Cook County Code, Sec. 38-118, which mandated ULMER's in-custody death shall be investigated by the Cook County Medical Examiner, and Sec.

38-121, which requires law enforcement officers, physicians, nurses, and ambulance attendants to report any such death "immediately," or within one hour of their becoming aware of the death.

**ANSWER: This paragraph calls for a legal conclusion, does not assert a factual allegation, and therefore no response by these Defendants is required by law. To the extent a response is necessary, Defendants deny the allegations contained in this paragraph.**

120. ULMER was not transported to the Mount Sinai Hospital morgue until approximately 11:16 PM—almost seven hours after he was pronounced deceased.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

121. Defendants LIEUTENANT KELLY and ASSISTANT DIRECTOR HOLLIS obstructed the medical providers of Mount Sinai Hospital from timely transporting ULMER's body to the morgue, which interfered with the posthumous investigation and autopsy findings.

**ANSWER: Defendants deny the allegations contained in this paragraph.**

122. Due to this delayed notification, Cook County Medical Examiner Medicolegal Death Investigator Kayla Ferradino #78 did not arrive at the Mount Sinai Hospital morgue until 11:40 PM. Ferradino observed ULMER's body and reported that his wrists and ankles had lacerations and that his high right knee had an abrasion.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

123. Ferradino arrived at the Jail at 12:24 AM on June 22, 2024. CERMAK HEALTH SERVICES staff informed Ferradino that the scene had already been cleared, including the blood found, but Illinois State Police had documented the scene prior to her arrival.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

124. The Cook County Medical Examiner ruled the manner of death as a homicide due to it being partially caused by the volitional acts of someone else.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

125. Information reported to Illinois State Police and the Cook County Medical Examiner by involved COOK COUNTY SHERIFF and CERMAK HEALTH SERVICES employees was conflicting and/or inconsistent regarding timing, sequence, medical treatment rendered, use of force, and use of restraints.

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

126. The autopsy noted a blunt-force injury to ULMER's head. Approximately 5 inches above ULMER's right ear, a 0.5 inch linear abrasion was found, along with a 4 inch by 2 inch contusion on the surrounding scalp. The injury on ULMER's head was consistent with reported blunt force injury which happened earlier on the day of his death. A neuropathology consultation revealed a 6.9 cm by 5.4 cm acute subarachnoid hemorrhage on ULMER's brain but incorrectly lists the injury as having occurred after ULMER "fell and bumped head on wall 2 days prior."

**ANSWER: Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

127. The autopsy indicated injuries to ULMER's left and right wrists, including 0.7 inch black lacerations and contusions in circumferential fashion, and 0.3 inch abrasions and contusions around ULMER's left and right ankles. Soft tissue hemorrhages were identified on ULMER's right

and left shoulders, wrists, and ankles; however, measurements of the size of these injuries were not provided in the autopsy.

ANSWER: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

**Count I – FOURTEENTH AMENDMENT VIOLATIONS 42 U.S.C. § 1983**
**(Use of Excessive/Deadly Force)**
**Against SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

The allegations contained in Count I of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count I. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count II - FOURTEENTH AMENDMENT VIOLATIONS 42 U.S.C. § 1983**
**(Failure to Intervene/Failure to Protect/Bystander Liability)**
**Against SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, OFFICER KAVANAUGH, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, HAQ, and TAWADROS**

The allegations contained in Count II of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count II. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count III - FOURTEENTH AMENDMENT VIOLATIONS 42 U.S.C. § 1983**
**(Delay/Denial of Medical Care)**
**Against SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, OFFICER KAVANAUGH, TRANI, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, KHAN, HAQ, and TAWADROS**

The allegations contained in Count III of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count III. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count IV - FOURTEENTH AMENDMENT VIOLATIONS 42 U.S.C. § 1983**
**(Punishment Without Due Process/Conditions of Confinement)**
**Against SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER RAJKOWSKI, and OFFICER ROMO**

The allegations contained in Count IV of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count IV. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count V – State Law Wrongful Death (Willful and Wanton Misconduct / Negligence)**
**Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

The allegations contained in Count V of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count V. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count VI – State Law Survival (Willful and Wanton Misconduct / Negligence) Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

The allegations contained in Count VI of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count VI. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count VII – State Law Wrongful Death (Battery) Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

The allegations contained in Count VII of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count VII. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count VIII – State Law Survival (Battery) Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

The allegations contained in Count VIII of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count VIII. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count IX – State Law Survival (Intentional Infliction of Emotional Distress) Against the COOK COUNTY SHERIFF, SERGEANT REYES, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, OFFICER ALVAREZ, OFFICER CODD, OFFICER MATANIC, OFFICER JACKSON, OFFICER LESNICKI, OFFICER O'HEARN, OFFICER NOVAK, OFFICER PRETO, OFFICER RAJKOWSKI, OFFICER ROMO, and OFFICER KAVANAUGH**

The allegations contained in Count IX of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count IX. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count X – State Law Wrongful Death (Medical Malpractice) Against COOK COUNTY d/b/a CERMAK HEALTH SERVICES, TRANI, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, KHAN, HAQ, and TAWADROS**

The allegations contained in Count X of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count X. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count XI – State Law Survival (Medical Malpractice) Against COOK COUNTY d/b/a CERMAK HEALTH SERVICES, TRANI, COLON, MUNOZ, JOHNSON, BALAWENDER, OMODARA, JAMES, SHEEHAN, KHAN, HAQ, and TAWADROS**

The allegations contained in Count XI of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count XI. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count XII – State Law Wrongful Death (Institutional Negligence)**
**Against COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES**

The allegations contained in Count XII of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count XII. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count XIII – State Law Survival (Institutional Negligence)**
**Against COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES**

The allegations contained in Count XIII of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count XIII. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count XIV – *Monell* Policy Claim Against the COOK COUNTY SHERIFF, in his official capacity**

The allegations contained in Count XIV of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count XIV. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**Count XV – State Law Survival (Conspiracy)**
**Against COOK COUNTY SHERIFF, OFFICER DAVIS, OFFICER SPRAYBERRY, OFFICER GARCIA, SERGEANT REYES, OFFICER CODD, OFFICER ALVAREZ, LIEUTENANT KELLY, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS**

354. Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

**ANSWER**: **Defendants reassert and reiterate their answers to the allegations contained in paragraphs 1 through 127 as fully set forth herein in this paragraph.**

355. Plaintiff, ROBERT ROBINSON, is the Administrator of the Estate of CORY ULMER, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

**ANSWER**: **Defendants lack sufficient information to admit or deny the allegations contained in this paragraph.**

356. Defendants OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA, together with their named and unsued co-conspirators, reached an understanding and engaged in a course of conduct to cover up the use of force and misconduct against ULMER which caused him to suffer a head injury.

**ANSWER**: **Defendants deny the allegations contained in this paragraph.**

357. In furtherance of this conspiracy or conspiracies, the Defendants OFFICER DAVIS, OFFICER SPRAYBERRY, and OFFICER GARCIA, together with their named and unsued co-conspirators, committed overt acts in furtherance of their conspiracy which included failing to report or document ULMER's injuries, failing to submit a written report, turning a blind eye, and failing to report the other officers' misconduct despite a duty to do so.

**ANSWER**: **Defendants deny the allegations contained in this paragraph.**

358. Defendants SERGEANT REYES, OFFICER CODD, OFFICER ALVAREZ, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS, with the named and other unsued co-conspirators, including police and prosecutorial investigative, medical, supervisory, executive, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to cover up the use of force and misconduct against ULMER that occurred at the direction of SERGEANT REYES.

**ANSWER**: **Defendants deny the allegations contained in this paragraph.**

359. In furtherance of this conspiracy or conspiracies, SERGEANT REYES, OFFICER CODD, OFFICER ALVAREZ, LIEUTENANT KELLY, EXECUTIVE DIRECTOR WILKS, DIRECTOR CARR, and ASSISTANT DIRECTOR HOLLIS, together with their named and unsued co-conspirators, took overt acts in furtherance of the conspiracy that included one or more of the following:

a) Preparing false reports,
b) Failing to document and misrepresenting ULMER's injuries,
c) Threatening witnesses,
d) Instructing medical providers not to document ULMER's injuries,
e) Spoliation of evidence,
f) Reviewing body-worn camera videos of an in-custody death in violation of Law Enforcement Officer-Worn Body Camera Act (50 ILCS 706/10-20(a)(6)),
g) Failing to provide body-worn camera video to investigators,
h) Failing to promptly report the in-custody death to the Cook County Medical Examiner,
i) Refusing to allow ULMER's body to be transported to the Mount Sinai Hospital morgue,
j) Interfering with or obstructing the Illinois State Police in-custody death investigation,
k) Interfering with or obstructing the Cook County Medical Examiner's investigation,
l) Failing to report ULMER's death as a homicide pursuant to the Illinois Reporting of Death in Custody Act (730 ILCS 210 *et seq.)* and/or the federal Death in Custody Reporting Act (H.R. 1447),
m) Refusing to provide records under lawful Freedom of Information Act requests, (n) Turning a blind eye to misconduct,
n) Failing to report the misconduct described above despite a duty to do so, and
o) Allowing a homicide to occur on their premises without taking disciplinary measures against those responsible.

360. Said conspiracies and overt acts were and are continuing in nature.

**ANSWER**: **Defendants deny the allegations contained in this paragraph, including subparagraphs "a" through "o."**

361. The acts of these Defendants are directly chargeable to the COOK COUNTY SHERIFF under state law pursuant to *respondeat superior.*

**ANSWER**: **Plaintiff's allegation that "the acts of these Defendants are directly chargeable to the COOK COUNTY SHERIFF under state law pursuant to *respondeat superior,"* states a legal conclusion, not a factual allegation, and no response is required by law.**

362. As described above, the COOK COUNTY SHERIFF has a pattern and practice of covering up or turning a blind eye to the use of excessive force by its officers.

**ANSWER**: **Defendants deny the allegations contained in this paragraph.**

363. The acts of these Defendants fall outside of routine police practice and were committed in order to cover up misconduct, protect their follow officers from disciplinary action and prosecution, avoid civil liability, and/or otherwise obstruct justice.

**ANSWER**: **Defendants deny the allegations contained in this paragraph.**

364. In addition to compensatory damages, Plaintiff will also seek to recover attorney's fees and costs incurred during the course of this litigation.

**ANSWER**: **Defendants deny all wrongdoing and deny that Plaintiff is entitled to compensatory damages and attorney's fees and costs.**

365. The actions of these Defendants were reprehensible, willful and wanton and malicious, thereby justifying an award of punitive damages.

**ANSWER**: **Defendants deny the allegations contained in this paragraph.**

**Count XVI – Indemnification Claim Against COOK COUNTY d/b/a CCHHS and CERMAK HEALTH SERVICES**

The allegations contained in Count XVI of plaintiff's complaint are not directed against these Defendants, and therefore, these Defendants make no answer to the allegations contained in Count XVI. To the extent an answer is required, Defendants deny all allegations contained in Count IV of plaintiff's complaint that may be directed against them.

**FIRST AFFIRMATIVE DEFENSE**
**QUALIFIED IMMUNITY**

Defendants did not cause the deprivation of any constitutional rights of Plaintiff's decedent. The conduct of Defendants was at all times objectively reasonable and did not violate any of Plaintiff's decedent's clearly established Constitutional rights. Defendants are entitled to the defense of qualified immunity.

**SECOND AFFIRMATIVE DEFENSE**

Defendants are immune from Plaintiff's state law claims under 745 ILCS 10/2-201 of Illinois Tort Immunity Act. Under 10/2-201 of the Tort Immunity Act, "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."

Dated: November 7, 2025

Respectfully submitted,

By: */s/ Lisa M. McElroy*
Attorney for Defendants

Monica Burkoth (burkothm@jbltd.com)
Lisa M. McElroy (mcelroyl@jbltd.com)
JOHNSON & BELL, LTD.
33 W. Monroe St., Ste. 2700
Chicago, Illinois 60603

## CERTIFICATE OF SERVICE

I, Lisa M. McElroy, hereby certify that on **November 7, 2025,** I caused to be served the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Lisa M. McElroy*